642 F.Supp. 1492 (1986)
TAX LEASE UNDERWRITERS, INC., et al., Plaintiffs,
v.
BLACKWALL GREEN, LTD., et al., Defendants.
No. 83-2448C(1).
United States District Court, E.D. Missouri, E.D.
September 4, 1986.
*1493 Veryl L. Riddle, J. Thomas Archer, Gerard T. Carmody, Gary S. Godwin, St. Louis, Mo., Bryan, Cave, McPheeters & McRoberts, for plaintiffs.
Joseph P. Conran, Michael A. Kahn, St. Louis, Mo., for defendants Blackwall Green, Ltd. and John R.D. Green.

MEMORANDUM
NANGLE, Chief Judge.
This is an action for breach of contract, fraud and quantum meruit. Defendants *1494 filed two counterclaims alleging breach of contract and fraudulent inducement. In the interest of clarity, the Court will briefly explain the circumstances which gave rise to this lawsuit.
In its simplest terms, this is a lawsuit over commissions earned from the sale of a special type of insurance known as Tax Benefit Transfer (TBT) insurance. The need for such insurance arose after the passage of the Economic Recovery Tax Act (ERTA) of 1981. Pub.L. No. 97-34, 95 Stat. 203. By creating § 168(f)(8), Congress authorized owners of business property to transfer tax benefits associated with such property by sale/leaseback agreements executed for tax purposes only. See I.R.C. § 168(f)(8).[1] This allowed an unprofitable company to raise revenue by leasing the tax benefit accruing to property without leasing the property itself to another company which was looking to shelter some of its taxable income. This transaction was referred to as a Safe Harbor Lease. Because only the tax benefit was transferred, and the actual underlying property remained in control of the seller of the tax benefit (the tax lessee), the purchaser (the tax lessor) usually required the tax lessee to indemnify the tax lessor in case a post-transfer event resulted in the disqualification and consequent loss of the tax benefit. Since the tax lessee was characteristically an unprofitable company one not in need of a tax shelter for company profitstax lessors usually demanded some form of collateral such as a letter of credit, a surety bond or a mortgage on property. These obligations were often burdensome on the tax lessees; therefore, the concept of insuring the tax benefit was conceived.[2] This case centers around approximately six million dollars in commissions earned from the sale of such policies.
This case was tried to the Court sitting without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 52.

FINDINGS OF FACT
1. Plaintiffs, Tax Lease Underwriters, Incorporated (TLU) and Tax Lease Management Corporation (TLM), are Colorado corporations with principal places of business in the State of Missouri. TLM was incorporated on February 16, 1982, and TLU was incorporated on July 14, 1982.
2. Defendant, Blackwall Green, Limited (Blackwall Green), is a corporation organized under the laws of the United Kingdom and is a broker of insurance at Lloyds of London (Lloyds).
3. Defendant, John R.D. Green, is a citizen of the United Kingdom and is Chairman of the Board of Directors of Blackwall Green, Limited. John Green has been a broker at Lloyds since 1949.
4. After the enactment of ERTA, Mr. Gallagher, a former Legislative Counsel to the Congressional Joint Committee on Taxation, met with two of his firm's clients, Robert Sutton and Gerald E. Fitzgerald, Jr., for the purpose of discussing the TBT insurance concept. Gallagher was not familiar with the insurance business and was seeking to discuss the possibility of TBT insurance with persons conversant in the insurance industry. Sutton and Fitzgerald referred Gallagher to Arthur A. Blumeyer, III, a St. Louis insurance broker with an extensive insurance background.
*1495 5. In late 1981, Gallagher, Blumeyer, Sutton, Fitzgerald and two insurance brokers, Edward Dipple and George Zimmerman, met in the Newark, New Jersey, airport to discuss the TBT insurance concept. The parties concluded that Lloyds would be the insurance market most likely to assume the multi-million dollar risk involved with this type of insurance. Following the meeting, Zimmerman arranged for a meeting in London with John Green of Blackwall Green.[3]
6. In January, 1982, Gallagher, Blumeyer and Dipple traveled to London to meet with John Green, his son James Green, also an employee of Blackwall Green, and Joe Adams, a director of Blackwall Green. The meetings concerned the concept of TBT insurance and the market potential for such insurance. It has been stipulated that no agreement regarding commission income from the sale of TBT insurance was reached during the January trip.
7. In February, 1982, Blumeyer and Gallagher returned to London for further discussions with James Green and Joe Adams. John Green did not attend any of the February meetings, as he was at that time in the United States.
8. At some point, over the course of numerous meetings spanning several days, James Green sketched several flow charts depicting various examples of how commissions would be divided on insurance risks. The notes indicate a difference between risks placed with the marine market and those placed with the non-marine market at Lloyds. The diagrams also indicate the inclusion of an administrative fee.[4]
9. Copies of the diagrams were made by Blumeyer and distributed to the parties present. The notes are all undated and no signatures are present on any of the pieces of paper. No other writings from the February meetings were produced at trial.
10. At the time of the February meetings, the concept of TBT insurance had not been presented to the underwriters at Lloyds nor were any underwriters committed to underwrite this kind of risk. As a result, no commission percentages or structures had been set up by Lloyds with respect to TBT insurance. Additionally, the parties had not yet finalized the TBT insurance policy form.
11. Following the February meetings, Blumeyer returned to the States and established two Colorado corporations, TLU and TLM. The purpose of TLU was to market TBT insurance. TLM was established to perform the monitoring function for the insurance. The companies were formed with Blumeyer owning 40%, Sutton and Fitzgerald owning 40% and Gallagher owning the remaining 20%.
12. Blumeyer, to the defendants' dismay, was not careful in keeping the two corporations separate. In several pieces of correspondence, including the initial letter sent to prospective TBT purchasers, Blumeyer indicated that TLM was involved in the marketing of TBT insurance. This prompted several responses from defendants who felt it was necessary to keep TLM, the proposed monitoring agent, entirely separate and independent of the marketing aspects of the insurance. This was, no doubt, due in part to the fact that, as originally envisioned, the monitoring function would be a relatively simple task. By keeping TLM separate, the parties felt that there was a potential to guarantee an additional 4% commission on every TBT policy without much additional work. Failure to keep the monitoring agent separate would *1496 give the 4% monitoring fee the appearance of an excess commission.
13. The power to appoint a specific monitor is vested in the Lloyds underwriters. The underwriters also determine the fee to be paid for the monitoring services. Monitoring, as it turned out, was a significant undertaking with respect to this type of insurance. It requires a complete and thorough yearly review of the tax lessee's operations to insure that the company took no actions which would disqualify the tax benefit. In addition, the qualifying property must be examined in certain cases because, for example, destruction of the property could result in a loss of the tax benefit.
14. On March 23, 1982, Blumeyer placed an advertisement for TBT insurance in the Wall Street Journal. Similar advertisements were placed by Blumeyer in various insurance publications. Blumeyer also mailed an introductory letter to all the Fortune 500 companies. According to Blumeyer and his secretary, Minette G. Bethke, the advertisements produced an overwhelming response. Blumeyer stated that all calls were followed up by written correspondence and a list of the calls was given to the Greens. As this novel concept of insurance became known, various articles appeared regarding TBT insurance.
15. Blumeyer stated at trial that after March, 1982, he was spending up to 95% of his time on TBT insurance. He also stated that during that period he was talking daily with Gallagher and almost daily with the Greens.
16. In April, 1982, the Risk Insurance Management Society (RIMS) held its annual convention. The Greens, Blumeyer and Fitzgerald were all in attendance and sponsored a hospitality suite.
17. On May 26, 1982, a promotional seminar was held at the Regency Hotel in New York City. The seminar was attended by Blumeyer and the Greens.[5]
18. On August 27, 1982, the first TBT insurance policy was sold by Blackwall Green to Pan American World Airways. The policy differed markedly from that first proposed by Gallagher and Blumeyer in the January meetings. The principal difference concerned the designation of the loss payee. Under the original concept, upon a disqualifying event covered by the policy, the tax lessee would be paid. Under the terms of the Pan Am policy and all subsequent policies, the tax lessor was the loss payee. In addition, the first proposed TBT policy contained numerous exclusions which lessened its value to the insured party. These revisions to the TBT policy were done by John Green working extensively with Laurence K. Billett of Pan Am. John Green spent significant amounts of time in the United States prior to the sale of the first TBT policy to Pan Am. Blumeyer was not present at any of the meetings with Pan Am. Blumeyer was, however, provided with a copy of the new TBT policy after the completion of the Pan Am transaction. The placement of the insurance in the Lloyds market also differed significantly from that envisioned by the parties in February, 1982. Lloyds required the TBT insurance to be placed in what is referred to as the "dual market". This means that it was necessary to approach approximately two hundred underwriters in both the marine and non-marine markets and offer to them the opportunity to underwrite TBT insurance. Approximately thirty Lloyds syndicate underwriters actually participated in the TBT insurance business.
19. As the Greens worked with the Lloyds underwriters, other changes were made to the TBT commission arrangement. The underwriters rejected a request by Blackwall for a ten percent monitoring fee and eventually settled on four percent. *1497 The underwriters also rejected blanket approval of TLM as the monitoring agent. The underwriters insisted that the appointment of the monitoring agent be done on a case by case basis. The request for an administrative fee was also rejected by the underwriters. Finally, it was decided that the policy terms would range from five to ten years with commissions paid annually over the life of the policy.
20. For the Pan Am TBT policy, TLM was appointed the monitoring agent for the first year. TLU was not recognized by any party as a broker for the Pan Am transactions. Blackwall Green issued a cover note to Jardine, Ter Bush and Powell, Inc., a U.S. broker, who in turn issued a cover note to Pan Am.
21. On November 4, 1982, Blumeyer was indicted for bribery in Cole County, Missouri. The indictment was voluntarily dismissed by the Cole County prosecutor on October 12, 1983. After the indictment, Blumeyer voluntarily removed himself from any involvement in the monitoring aspects of the TBT policies. Blumeyer did continue to some extent to market and promote TBT policies.
22. Following the indictment, TLM was not appointed as monitoring agent for any other TBT policy. With the exception of the first year of the Pan Am policy, Gallagher and his law firm have been appointed the monitoring agent for all TBT policies and are receiving the 4% monitoring fee. There is no evidence that Blackwall Green received any fee from the monitoring of a TBT policy.
23. On November 9, 1982, Blackwall Green paid TLM $8,876.96 as a monitoring fee on the first year of the Pan Am TBT. On January 18, 1983, Blackwall Green paid TLM an additional $13,315.44. In March, 1983, Blackwall Green paid TLU $207,832.00. Blackwall refers to this final sum as an ex gracia payment. The payment was intended to compensate Blumeyer's companies for what defendants believe plaintiffs had done in connection with the development and sale of TBT insurance.[6] Other ex gracia payments in connection with the development of TBT insurance were made to Lockwood, Dipple and Green, Inc., a United States broker, and to George Zimmerman in recognition of their participation in introducing Gallagher and Blumeyer to Blackwall Green. Alexander and Alexander, an insurance brokerage firm, although not recognized as a producing broker, was also paid $50,000.00 for its work in laying the ground work for Eastern Airlines' TBT insurance policies.
24. In all, 48 TBT insurance policies were brokered by Blackwall Green through Lloyds of London.[7] A 25% commission was charged on every TBT insurance policy. In none of these transaction was TLU recognized as either the retail or wholesale producing broker or the surplus line broker.[8] With the possible exception of one or two companies, however, Blumeyer communicated *1498 with every company that had purchased a TBT insurance policy.
25. TLU was recognized as a broker for two potential TBT policies, Breaker Records and Air Virginia. However, neither deal came to fruition.
26. Plaintiffs filed the present action on October 20, 1983. In their first amended complaint, plaintiffs named Gallagher as a defendant. Subsequent to the filing of the amended petition, Gallagher was dropped from the suit and a general release of all claims against Gallagher was executed by plaintiffs and Gallagher as part of a settlement agreement.

CONCLUSIONS OF LAW
The Court has jurisdiction pursuant to 28 U.S.C. § 1332. Venue is proper within this District. In addition, the Court finds that Missouri law governs the controversy between these parties.
The first issue for the Court to decide is whether a contract existed between the parties. Plaintiffs argue that a contract was entered into during the February meetings which provided the following:
(A) TLU and TLM would be incorporated; TLU would begin marketing TBT insurance to potential customers in the United States; and Blackwall Green would broker TBT insurance with Underwriters;
(B) Blackwall Green would pay 50% of all sums retained by Blackwall Green to TLU for all TBT insurance brokered by Blackwall Green with Underwriters whether such insurance was produced by TLU or not and TLU would act as the exclusive representative of Blackwall Green for TBT insurance in the United States;[9]
(C) Blackwall Green would attempt to secure a 4 percent monitoring fee (to be paid to TLM) on each TBT insurance risk brokered with Underwriters; TLM would agree to monitor property subject to TBT insurance and safe harbor tax leases; and any TLM profits after expenses would be divided equally between TLM and Blackwall Green; and
(D) Blackwall Green would fully and completely account to TLU and TLM for all TBT insurance brokered by Blackwall Green with Underwriters, for all sums received or paid by Blackwall Green referring or relating to TBT insurance, for the method or manner of brokering each risk, and for all other matters related thereto in any way.
In order for plaintiffs to prevail, they must prove the existence of a valid contract. For a contract to be valid and enforceable, there must be a meeting of the minds and the essential terms must be certain. Elliott v. Johnston, 673 S.W.2d 807, 809 (Mo.Ct.App.1984). See also Middleton Enterprises, Inc. v. Churm, 618 F.Supp. 477, 480 (E.D.Mo.1985) ("It is fundamental that an oral contract will not be found unless the parties have reached an understanding as to all the initial terms of the agreement." (case cites omitted)). The requirement of definite terms is to enable a court to enforce the contract agreed upon. Hopper Furs, Inc. v. Emery Air Freight Corp., 749 F.2d 1261, 1264 (8th Cir.1984); Marshall v. Edlin, 690 S.W.2d 477, 480 (Mo.Ct.App.1985); Shofler v. Jordan, 284 S.W.2d 612, 614 (Mo.Ct.App.1955). It is axiomatic that the Court will not write a contract for the parties that they did not make for themselves.
For purposes of clarity, the Court will separately analyze the claims of the plaintiffs. Under each cause of action, TLM seeks to recover monitoring fees and TLU seeks to recover one-half of all of the commissions earned by Blackwall Green from the sale of TBT policies. Turning *1499 first to TLU, plaintiffs argue that the alleged contract between the parties requires Blackwall Green to pay TLU one-half of all commissions earned on TBT policies, whether TLU produced the business or not. In support of their position, the plaintiffs direct the Court to the flow charts and diagrams drafted by James Green during the February meetings. The Court finds plaintiffs' position that James Green's notes constitute a binding contract unrealistic.
At the time the notes were drawn, TBT insurance was little more than a concept. The parties had not yet attempted to sell a policy nor had they even reviewed the actual wording of the policy. See Findings of Fact Nos. 10, 18 and 19. In addition, the Greens had not yet approached the underwriters to determine whether or not Lloyds would even accept the risk. See Findings of Fact No. 10. Finally, since it is the underwriters who determine the allowable commissions on a policy, any commission arrangement would be speculative at best. James Green's notes taken during the February meetings reflect the fact that the parties did not know how much commission would be allowed on each TBT policy. See Findings of Fact No. 8. Moreover, the parties clearly did not anticipate that Lloyds would require the insurance to be placed in the dual market. See Findings of Fact No. 18. The dual market requirement and the revisions to the actual policy required considerable time and effort on the part of the Greens. See Findings of Fact Nos. 18 and 19. Under these circumstances, with so little known about the insurance, defendants' position that they did not enter into an exclusive arrangement with Blumeyer during the February meetings requiring an even split of commissions is highly credible.
TLU seeks to demonstrate Blackwall Green's acknowledgment of the contract by directing the Court's attention to numerous telexes and letters which were exchanged by the parties. While these exchanges are indicative of a business relationship between the parties, if plaintiffs are to prevail they must prove the existence of a valid contract. It is significant that in the correspondence, defendants never acknowledge the existence of an exclusive arrangement with TLU. Furthermore, the Court credits the testimony of John and James Green, who stated that exclusive arrangements were not favored by Lloyds and therefore rarely, if ever, given.
The correspondence between the parties tends rather to disprove the existence of a contract. The letters and telexes indicate that the parties did not have a "meeting of the minds" with respect to their agreement. The Court, even after the trial of this case, is at a loss to explain exactly what function TLU was to perform. Initially, Blumeyer stated that TLU was to act as both a retail and a producing broker, depending on the source of the client. See Findings of Fact No. 24. In fact, TLU performed in neither capacity on any deal which was completed. See Findings of Fact Nos. 24 and 25. In their trial briefs, plaintiffs state that TLU was also ready to act as a surplus lines broker. In view of the requirements necessary to perform this function, the Court finds this argument frivolous.
Moreover, besides disagreeing over TLU's position in a TBT insurance transaction, the parties were also not in agreement over exactly what work was to be done by TLU. Defendants envisioned TLU as a producer of clients ready to purchase a policy brokered by Blackwall Green. Blumeyer and TLU, on the other hand, sought simply to introduce the TBT insurance concept to prospective clients and then refer the business to defendants. As a result, the Greens were required to spend considerably more time in the United States on TBT business then they had originally anticipated. See Findings of Fact No. 18. The parties' mutual dissatisfaction with each other's conduct further buttresses the Court's conclusion that the parties did not have a meeting of the minds with respect to the division of commissions from TBT policies.
*1500 The defendants also expressed considerable displeasure with Blumeyer's use of TLM's name in connection with the marketing aspects of TBT insurance. See Findings of Fact No. 12. The Greens continually insisted that TLM's activities be limited solely to the monitoring aspect. This was to insure that clients and the underwriters would not view the monitoring fee as simply an additional and unnecessary expense.[10]
Plaintiffs' final piece of evidence in support of their allegation of the existence of a valid contract is an answer to an interrogatory wherein Gallagher states that an agreement was reached between the parties during the February meetings. In a prior response to the same question, Gallagher stated that no agreement had been reached. The Court finds Gallagher's deposition testimony and interrogatory answers to be of questionable credibility. Besides his prior inconsistent statement, the answer is simply a general statement with little supporting evidence. Moreover, Gallagher was significantly involved with both sides of the lawsuit. He was, and possibly still is, a shareholder and officer of TLU and TLM. Blumeyer stated at trial that it was his understanding that Gallagher would serve as counsel for TLU and TLM. Gallagher denies he ever accepted such a role. On the other hand, Gallagher is currently performing the monitoring functions on all the TBT policies brokered through Blackwall Green. While disagreeing on many aspects of this case, the parties did appear to agree on the fact that neither side was satisfied with Gallagher's participation in the underlying business transactions or the trial of this case.
Upon review of the evidence adduced at trial, the Court finds that plaintiffs have failed to prove the existence of a valid contract which provides for an even split of all commissions earned by Blackwall Green on the sale of TBT insurance. Accordingly, TLU's claim for breach of contract must fail.[11]
With respect to TLM, the Court finds that TLM's claim for monitoring fees must fail. With the exception of the first year of the Pan Am TBT, TLM was not appointed by the underwriters to monitor a TBT policy. See Findings of Fact No. 22. Clearly, the parties contemplated that the actual monitoring would have to be done by Gallagher, since he was the only one with the tax expertise. Once Blumeyer was indicted, plaintiffs acquiesced to the appointment of Gallagher and his law firm instead of TLM as the monitoring agent. See Findings of Fact No. 21.
TLM's claim for monitoring fees must fail for several other reasons. First, even assuming a valid contract between the parties, Blackwall Green's obligation was to attempt to secure the monitoring function for TLM. The Court finds defendants' alleged contractual obligation with respect to TLM to be too vague and, therefore, incapable of enforcement. In addition, Blackwall Green has not received any commissions or profits in connection with the monitoring aspects of the TBT transactions. See Findings of Fact No. 22. Finally, as noted above, the Court finds that plaintiffs have failed to demonstrate the existence of a valid contract between the parties requiring any division of fees or profits. Accordingly, TLM's claim for damages based on breach of contract must also fail.
Count II of the complaint alleges that defendants conspired to commit fraud against the plaintiffs. Plaintiffs argue that Gallagher's trip to London in November, 1982, for a "secret meeting" with the Greens to discuss the Blumeyer indictment *1501 and the future of TBT insurance is proof of a conspiracy. The Court finds that this one fact, even if true, is insufficient evidence of a conspiracy to commit fraud. Moreover, after the indictment plaintiffs agreed that Blumeyer should keep his name out of the picture for a while to avoid any detrimental effects on the TBT insurance business. Plaintiffs acquiesced to appointing Gallagher instead of TLM as the monitoring agent. See Findings of Fact No. 21. Whatever significance there was to the alleged "secret meeting", it is undercut by the subsequent conduct of the plaintiffs. The record is barren of any additional evidence of a conspiracy to commit fraud on the part of the defendants. Accordingly, the Court finds that plaintiffs are not entitled to any recovery on Count II of their complaint.
In Count III, plaintiffs seek recovery for the expenditure of resources and efforts on the part of TLU and TLM under quantum meruit. Quantum meruit is based on a promise implied by the law that a person will pay reasonable compensation for valuable services or materials provided at his request or with his approval. Under Missouri law:
To recover in quantum meruit, a plaintiff must plead and prove that it provided to defendant materials or services at the request or with the acquiescence of defendant, that those materials or services had a certain reasonable value, and that defendant, despite demands of plaintiff, has failed and refused to pay the reasonable value of those materials and labor. (case cites omitted).
Berra v. Bieg Plumbing Co., Inc., 584 S.W.2d 116, 118 (Mo.Ct.App.1979). The plaintiff has the burden of proving the reasonable value of materials and services furnished and failure to do so is fatal to recovery. Id. See also McCardie & Akers Construction Co. v. Bonney, 647 S.W.2d 193, 194 (Mo.Ct.App.1983).
In the case at bar, plaintiffs allege a significant expenditure of time and resources in marketing TBT insurance. It is undisputed that Blumeyer, on behalf of TLU and TLM, placed advertisements in the Wall Street Journal, responded to inquiries and made several mailings in connection with the marketing of the insurance. See Findings of Fact Nos. 14 and 15. Moreover, there is no question that he participated to some extent in the arrangement and presentation of the promotions at the RIMS convention and the New York seminar. See Findings of Fact Nos. 16 and 17. At the trial of this case however, plaintiffs did not attempt to demonstrate the reasonable value of the materials and services actually furnished by plaintiffs or their employees. Instead, plaintiffs simply argue that they are entitled to 50% of all the commissions earned by Blackwall Green and a 4% monitoring fee as the reasonable value of their services. Plaintiffs' demand and argument in support thereof miss the mark. Certainly, defendants would concede that had Blumeyer not brought the idea of TBT insurance to Blackwall Green, defendants would not have earned any commissions because they probably would not have ever been in the business. However, the fact that Blumeyer introduced the business to defendants does not support a finding that the value of materials and services provided by plaintiffs is approximately four million dollars. Certainly, plaintiffs expended some effort in their promotion efforts. In an obvious tactical decision, however, plaintiffs sought not to demonstrate the exact amount of the services rendered but instead asserted the position that the reasonable value of the goods and services provided was that reflected by the alleged agreement; to-wit, 50% of all commissions and a 4% monitoring fee.[12] Since plaintiffs failed to demonstrate what services were rendered, the *1502 Court has no choice but to allow those services which were rendered to go unrewarded. Accordingly, plaintiffs' demand for damages under Count III must be denied.
Defendants, in response to plaintiffs' complaint, filed counterclaims alleging, inter alia, breach of contract and fraudulent inducement. The Court agrees with defendants' assertion that a finding by the Court that no contract existed between the parties renders the counterclaims moot. Accordingly, based on its findings above, the Court will dismiss defendants' counterclaims as moot.
The Court finds it necessary to briefly comment on the conduct of defendants' counsel in this case. After their relatively late appearance in this case, counsel for defendants sought several continuances for the purpose of embarking on new discovery ventures.[13] Much of this later discovery (not all, of course) delved into many matters which were clearly not relevant (and bore the appearance of attempts to prejudice the Court against the plaintiffs). For example, defendant expended extensive efforts in developing evidence and in briefing Blumeyer's alleged "embezzling hundreds of thousands of dollars", "laundering ... money", Blumeyer's "prior and ongoing criminal activities", "paying of bribes", Blumeyer's "concealment of his father's central role in the infamous St. Louis Fire and Marine scandal", etc.
The court file contains several other examples of unnecessary acts of discovery on the part of defendants' counsel.[14] As a result of these actions of defendants' counsel, the trial of this case was unduly delayed, witnesses were unnecessarily deposed and an inordinate amount of the time of this Court and its staff was wasted. In the opinion of this Court, these actions constitute a classic example of discovery abuse and of impeding the orderly administration of justice.[15]

ORDER
Pursuant to the memorandum filed herein on this day,
IT IS HEREBY ORDERED, ADJUGED AND DECREED that judgment be and is entered for defendants on plaintiffs' complaint and said complaint be and is dismissed with prejudice.
IT IS FURTHER ORDERED that defendants' counterclaims be and are dismissed as moot.
IT IS FURTHER ORDERED that defendants' Rule 41(b) motion for involuntary dismissal at the close of plaintiffs' case be and is denied.
IT IS FURTHER ORDERED that plaintiffs' motion for sanctions be and is denied.
IT IS FURTHER ORDERED that each side shall bear its own costs in this matter.
NOTES
[1] Congress revised this section in August, 1982, significantly reducingif not eliminatingthe market for TBT insurance by the end of 1983.
[2] While there has been some suggestion to the contrary, the parties generally give credit for the development of the TBT insurance concept to Thomas J. Gallagher, Jr., a tax attorney who served as Legislative Counsel to the Congressional Joint Committee on Taxation and participated in the drafting of the Safe Harbor Lease Provisions of ERTA. Mr. Gallagher left governmental service in September, 1981, and returned to private practice in Washington, D.C.
[3] It is the broker's responsibility to convince Lloyds' underwriters to accept a certain insurance risk and to obtain the best deal on behalf of the broker's client. Under Lloyds' rules, only a Lloyds' broker can deal with Lloyds' underwriters. Therefore, Blumeyer was not able to deal directly with the underwriters but instead was required to deal with a Lloyds' broker, such as Blackwall Green.
[4] The administrative fee, also referred to as a profit commission or a cover holder fee, is allowed by Lloyds Underwriters in certain instances to cover additional costs which may be incurred.
[5] While unnecessary to its resolution of the issues in this case, the Court notes that the parties strongly disagree over the usefulness of both the RIMS hospitality suite and the New York seminar. Plaintiffs insinuate that these were extremely worthwhile marketing efforts. Defendants, on the other hand, state that the efforts were a failure because Blumeyer failed to "beat the bushes" for a significantly large number of prospective clients and brokers to make the trips worthwhile.
[6] Blackwall states that the ex gracia payment was for $250,000.00. However, approximately $44,000.00 was deducted from the payment and sent to Gallagher to satisfy outstanding legal bills sent to TLU and TLM for Gallagher's legal work. The amount was accounted for on the books at Blackwall Green as 6% on the Pan Am transaction and 2.5% on the remaining TBT transactions which closed before December 31, 1982. The Court rejects plaintiffs' argument that Blackwall Green's decision to spread the payment over several TBT transactions for bookkeeping purposes is recognition of an agreement to split its commissions with TLU and TLM.
[7] As of the date of trial, no claim against the insurance has ever been made on any TBT policy.
[8] A producing retail broker is the broker with whom the insured party deals directly and to whom the client pays the premium. The wholesale broker is the broker to whom the retail broker goes in order to get connections in the specific market which retailers want to reach. A surplus lines broker is responsible for filing an affidavit stating that the business is surplus to the regular market. In addition to the affidavit, the surplus lines broker needs a special license, must pay a tax and must issue a cover note for the policy. It was Blumeyer's position at trial that TLU would act as the retail broker for Gallagher's current clients and as the wholesale broker for all other clients.
[9] Plaintiffs allege that the agreement provided for a commission of 62½% for TLU on policies which recognized TLU as the retail broker. TLU was to receive 50% on policies where it was recognized as the wholesale broker. However, since TLU was never recognized as either a wholesale or retail broker on any TBT policy, the Court will only concern itself with plaintiffs' allegation that TLU was to receive 50% of the commission on all TBT policies brokered by Blackwall Green.
[10] While initially viewed as a continuing source of income for all participants, the monitoring function turned out to be an extensive and costly undertaking. Gallagher testified at his deposition that the cost of monitoring exceeded the 4% commission fee allowed by the underwriters.
[11] As a result of the Court's finding that no contract existed between the parties, it is unnecessary to reach the merits of defendants' argument that the lack of a writing signed by the parties violates the statute of frauds.
[12] In their post-trial brief, plaintiffs reduce their demand somewhat in that they allege that the award of a 6% commission in the Pan Am TBT supports a finding that the reasonable value of plaintiffs' services equals at least 6% of every TBT transaction, or approximately $1,864,000. The Court rejects this assertion for the same reasons it rejects plaintiffs' demand based on the alleged contract terms.
[13] On November 1, 1985, when present counsel for defendant was allowed to enter their appearance, the case was on a non-jury trial docket for January 27, 1986. Much discovery had been completed and the case was seemingly ready for trial. In order to accommodate defendant, a continuance was ultimately granted.
[14] In addition to their discovery abuses, defendants' counsel saw fit to bombard the Court with an eighty-one page pre-trial brief. The excessive length is not the result of a thorough analysis of the relatively straightforward issues involved in this case. The length is due to the fact that counsel found it necessary to include numerous gratuitous personal attacks on the character of Mr. Blumeyer.
[15] The Court, following the close of all the evidence, directed plaintiffs' counsel to file a motion for sanctions in connection with the conduct of defendants' counsel in this case. In reviewing plaintiffs' motion, the Court finds it must deny the request for sanctions at this time for several reasons. First, plaintiffs' motion encompasses more conduct than that to which the Court objects. As a result, the Court would be required to spend considerable additional time sorting out all the events which occurred in the six months preceding the trial. Second, plaintiffs' counsel failed to timely object to certain conduct on the part of defendants' counsel prior to its occurrence. For these reasons, the Court will deny plaintiffs' motion for sanctions without prejudice.