**KINETIC ENERGY DEVELOPMENT CORP., Appellant,**

v.

**TRIGEN ENERGY CORPORATION, Respondent.**

**No. WD 54751.**

Missouri Court of Appeals, Western District.

Submitted Aug. 20, 1998.

Rehearing Granted Feb. 25, 1999.

Decided Sept. 7, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 2, 1999.

Phillip Sanford Smith, Kansas City, for appellant.

Byron J. Beck, Kansas City, for respondent.

Before SMART, P.J., ELLIS and HOWARD, JJ.

JAMES M. SMART, Jr., Judge.

Kinetic Energy Development Corp. ("Kinetic") brought an action in quantum meruit against Trigen Energy Corporation ("Trigen") and obtained a jury verdict in the amount of $4,271,000.00. After trial, the circuit court granted Trigen's motion for judgment notwithstanding the verdict ("JNOV") or, in the alternative, for new trial. Kinetic appealed, claiming that the trial court erred in granting Trigen's motion for JNOV and in granting a new trial to Trigen. This court issued a decision affirming the award of new trial and reversing the judgment notwithstanding the verdict. Trigen moved for rehearing, contending, *inter alia,* that our analysis of the issue of reasonable value was erroneous. We granted rehearing because we believed that our previous opinion failed to adequately address the issues related to proof of valuation of Kinetic's services. Although we still, in this opinion, vacate the JNOV, we attempt to give much more specific guidance to the parties and to the court as to a retrial.

## Factual Background

The Kansas City steam distribution system consists of distribution pipes and a steam generating power plant serving a substantial part of downtown Kansas City. The system was built at the turn of the century, and served office buildings and manufacturing plants over the years. The steam system's pipes are underground pipes designed to deliver the steam to the various customers on the steam system. The system included a power plant known as the Grand Avenue Station, which generates the steam from boilers. Kansas City Power and Light Company (KCPL) owned the system since its inception.

In the latter part of this century, real estate developers began to construct buildings designed to use electricity rather than steam. The gradual changeover to electricity caused the customer base of the steam system to decline.

In 1987, due to the age and market circumstances of the steam system, KCPL decided that it wished to abandon its ownership of the system and to convert the steam customers to electricity. In order to abandon the steam system, however, KCPL was required to petition the Missouri Public Service Commission (MPSC) for permission to abandon the system, to discontinue steam service, and to convert those customers to electricity. Accordingly, KCPL did apply to the MPSC for such permission. The MPSC determined it was not in the best interest of the public or of KCPL's customers to allow abandonment of the system without seeing if the system could be sold to someone who would attempt to serve the need of those customers still using steam.

On October 7, 1987, the MPSC ordered KCPL to make a good faith effort to sell the Kansas City steam system, and rejected the proposal to convert its steam customers to electric heating equipment. However, the MPSC informed KCPL that it would be allowed to close down the system December 31, 1990, if the system were not sold by that date. On January 25, 1988, in response to the MPSC's order, KCPL published a Request for Proposals (RFP), asking any interested parties to submit proposals for the purchase of the Kansas City steam system by March 25, 1988. The RFP required an earnest deposit in the amount of $100,000.00 for the purpose of demonstrating good faith intent to complete negotiations.

At the time of the publication of the RFP, Kinetic Energy Development Corp. was a small company which had been formed a year earlier by William "Tab" Schmidt and Jerry Corbier. The intention of Kinetic's organizers was to develop opportunities to acquire energy systems, and then to bring into each project a financial partner which would provide the resources for the acquisition and operation of the energy system. Kinetic looked at opportu-

nities to acquire different systems, and had already involved itself in an effort to acquire steam systems in Tulsa and Oklahoma City. Kinetic responded to KCPL's RFP with a proposal indicating that it wished to attempt to work toward the purchase of the distribution system (the pipes) for $4 million, or, alternatively, the purchase of the entire system, including the power plant, for $6 million. Kinetic offered a corporate guarantee of $100,000.00 in lieu of the cash deposit. The $100,000.00 corporate guarantee specified that it would expire at the execution of an actual agreement for the purchase and sale of the distribution system, or upon the rejection by KCPL of Kinetic's negotiations, or upon the failure to achieve an agreement by December 31, 1988. Three other proposals were also received by KCPL. Only one other proposal, that of an organization called Catalyst Thermal, offered to pay any money for the system. Catalyst Thermal offered to pay $2.8 million for the system, and also demanded the right to be able to co-generate electricity at the power plant, and not just steam.

On May 24, 1988, KCPL conditionally accepted Kinetic's proposal to purchase the steam distribution system (without the power plant) for $4 million. KCPL made clear that its acceptance was conditioned upon the definitive negotiation of all necessary terms and conditions of an agreement for purchase and sale, and on the acquisition of all necessary regulatory approvals, and the satisfaction of all the terms and conditions of the Request for Proposals. The only provision of the RFP to which Kinetic took exception in its response was the provision requiring the cash deposit of the sum of $100,000.00, as already mentioned. Kinetic represented in its response that it already had the financing capability to acquire and improve the steam system, and further represented that it already had made provision for the construction of its own power plant, although Kinetic had neither the financing nor any provision for its own power plant.

Throughout the remainder of 1988, Kinetic attempted to obtain a financing commitment, but was unsuccessful in efforts to engage a financial partner. Earlier, Kinetic had also begun development efforts with regard to the district steam systems in Tulsa, Oklahoma, and in Oklahoma City. As to the Kansas City project, Kinetic and KCPL attempted to negotiate sales documents while Kinetic sought a financial partner and gathered information concerning the technical, operational, financial, environment, regulatory and marketing aspects of the steam system.

By December 1988, KCPL informed Kinetic that it was growing impatient over the lack of progress in the negotiations because of Kinetic's inability to arrange financing. KCPL advised Kinetic that it was necessary that the parties enter into a signed sales agreement by December 30, 1988. On December 30, 1988, KCPL informed Kinetic that because there was no signed sale agreement, KCPL was withdrawing its conditional acceptance of Kinetic's response to the RFP. KCPL added that it considered the negotiations to be concluded.

At this time, Kinetic was attempting to persuade Trigen Energy Co., a national energy company owned by large domestic and foreign entities, to get involved as a financial partner in both the Oklahoma systems and the Kansas City system. Trigen had earlier been aware of KCPL's attempt to sell the Kansas City steam system, but Trigen had elected not to pursue the acquisition of the system at the time the RFP was published. On January 13, 1989, Trigen and Kinetic and the principals of Kinetic (Schmidt and Corbier) entered into an agreement to work together on the acquisition and development of the Kansas City system and the Oklahoma systems. The agreement contemplated, *inter alia*, that Kinetic would be reimbursed certain expenses, Kinetic would transfer any "actual or implied right to purchase the system" to Trigen. The agreement contemplated that a Trigen

subsidiary would be formed to take title and to operate the system, and that Schmidt and Corbier would become employees of the Trigen subsidiary.

In the meantime, Kinetic was working on keeping alive the negotiations with KCPL, in spite of the fact that KCPL had indicated negotiations were over, and was requesting that the MPSC formally close the negotiations. Kinetic met with the staff of the MPSC and complained that KCPL was being inflexible with regard to certain provisions, including a provision of the RFP which specified that KCPL would later have the option of reacquiring the system under certain conditions. Kinetic requested that the MPSC order that negotiations be kept open longer. On January 20, 1989, Trigen notified in writing the MPSC and KCPL that it was now involved as a financial partner with Kinetic in the effort to acquire the steam system. Trigen confirmed that a formal agreement had been signed among Kinetic, its principals, and Trigen. Trigen assured the MPSC and KCPL that it had the resources to acquire and upgrade the steam system, and stated that it would endeavor not to duplicate the investigations already conducted by Kinetic. Because of Trigen's financial capability, the involvement of Trigen revived KCPL's interest in negotiating. The discussions with KCPL were renewed. In the meantime, the MPSC directed that negotiations continue. Trigen, in the process of gathering information, relied on Kinetic for certain information. Trigen also asked Kinetic to do specific things in an effort to gather information.

Trigen was not happy with the draft agreement between Kinetic and KCPL. Trigen suggested changes in the proposed transaction. For instance, Trigen suggested the idea of leasing a portion of the Grand Avenue station from KCPL and installing boilers. KCPL countered with a proposal that Trigen buy both the power plant and the pipes for a total of six million. Trigen then suggested that KCPL agree to buy some steam from Trigen. By March 6, 1989, the assets to be acquired had changed, and KCPL had expressed willingness to discuss the purchase of steam from Trigen. On March 27, the parties appeared before the MPSC and reported on the status of negotiations. All parties agreed there were important substantive issues to be resolved before any agreement could be reached. On May 11, 1989, KCPL and Trigen met with the MPSC staff and discussed the fact that there were still some things to be worked out. The staff recommended the matter be held open on the MPSC docket until July 1, 1989. Eventually, by June 1, 1989, KCPL agreed to pay the Trigen subsidiary $65,000 per month for at least two years for a back-up steam supply for electrical generation. In the meantime, on May 23, 1989, Kinetic and Trigen and Tab Schmidt had signed an agreement that Trigen would buy out Kinetic's and Schmidt's rights in both the Oklahoma systems and the Kansas City system. Trigen agreed to reimburse Kinetic for certain expenses, but the parties were unable to come to an agreement as to what Trigen would pay Kinetic and Schmidt for the buy-out of their "development rights." Jerry Corbier had agreed to become an employee of the new Trigen subsidiary and go to Oklahoma where he would serve the new Trigen corporation in managing the operation of the steam system. Trigen agreed to pay Kinetic the sum of $1.2 million in connection with the Oklahoma systems, and agreed to pay Schmidt a consulting fee of $12,500 per month for a three month period.

On June 1, 1989, Trigen, KCPL and Kinetic agreed that Trigen–KC (the new Trigen subsidiary corporation) would take title to the Kansas City system and operate the system. Trigen replaced Kinetic's corporate guarantee with a deposit of $100,000 cash. On December 29, 1989, the MPSC tentatively approved the proposed sale to Trigen, but specifically withheld final approval until March 29, 1990. Kinetic continued throughout early 1990 to

suggest that it was entitled to compensation for its "development rights as to the Kansas City system," but the parties were unable to reach an agreement. As the deadline for final approval of the sale approached, Kinetic claimed it was withdrawing the transfer of any rights to Trigen, and attempted to find another financial partner to bring in to acquire the system in lieu of Trigen. Kinetic was unsuccessful in engaging another company to come in and take Trigen's place. Kinetic finally informed Trigen that because it had not been paid for its rights, it objected to Trigen buying the system. Trigen nevertheless proceeded to the final closing of the transaction, and purchased the system.

On November 3, 1994, Kinetic filed an action against Trigen, alleging, *inter alia*, a claim of breach of contract and a claim of *quantum meruit*. The case was tried to a jury. The claim of *quantum meruit* was the sole claim submitted to the jury. The jury returned the verdict in favor of Kinetic in the amount of $4,271,000. Trigen filed a claim for JNOV or, in the alternative, for a new trial. On August 6, 1997, the trial court granted the motion. Kinetic appeals, contending that the trial court erred in granting Trigen's motion for JNOV and, alternatively for a new trial.

### The Claim

Kinetic's petition alleged that Kinetic furnished Trigen with goods and services, including, but not limited to, the "development rights" of the steam system, and the "work product" of Kinetic in "developing and acquiring the development rights." The petition also alleged that Trigen requested and accepted such goods and services; that such goods and services had a "certain reasonable value"; and that demand had been made of Trigen, but payment had been refused.

### The Trial

At trial, Kinetic presented evidence that it had obtained the right to negotiate a purchase of the steam system from KCPL, that it had gathered information as to the many aspects to be considered in connection with such a purchase, that it had brought Trigen into the transaction, that Trigen had utilized Kinetic's rights and the information gathered by Kinetic, and that Trigen had not paid Kinetic. Kinetic presented expert testimony suggesting that the reasonable value of Kinetic's development rights was between $3.4 million and $4.6 million. Kinetic's expert calculated the value by determining an estimate for the current value of the steam system, deducting the amount paid for the purchase and the amount spent for improvements to the system, and dividing the balance by one-half (on the theory that a development partner should be entitled to half the net value of the project). Trigen objected throughout the trial to the notion that Kinetic had valuable "development rights," and objected specifically to the valuation testimony of Carl Avers, Kinetic's expert witness, who keyed only on the development rights and failed to otherwise place any value on Kinetic's services. After the jury's verdict in favor of Kinetic in the amount of $4,271,000, the trial court granted Trigen's motion for JNOV on the ground that the only evidence of the reasonable value of Kinetic's services furnished to Trigen was Avers' testimony, which was based exclusively on Kinetic's "right to acquire the system." The court held that Kinetic failed to establish that it transferred to Trigen an exclusive and valuable right to purchase the steam system, and that Avers' valuation methodology was defective in that he refused to consider any other possible way of approaching valuation. The court noted that Avers specifically contended that the individual services performed by Kinetic (such as obtaining market information and technical data) were irrelevant to the valuation. Accordingly, Avers paid no attention to the nature of the goods and services themselves, and refused to state an opinion of the value of the specific goods and services furnished Trigen.

The trial court also ordered that, in the event the JNOV were not sustained on appeal, a new trial should be conducted on several grounds, including the ground that the verdict was against the weight of the evidence.

## JNOV

In its first point, Kinetic asks that we review the trial court's grant of a JNOV to Trigen because Kinetic sufficiently proved its quantum meruit damages. Review of the trial court's rulings on motions for a JNOV is performed regarding the evidence in the light most favorable to the jury's verdict. *Seitz v. Lemay Bank & Trust Co.*, 959 S.W.2d 458, 461 (Mo. banc 1998). We look at all favorable evidence and reasonable inferences flowing therefrom, discarding all unfavorable evidence and inferences. *Id.* We will affirm the trial court's grant of a JNOV only where we find that the plaintiff failed to make a submissible case. *Jungerman v. City of Raytown*, 925 S.W.2d 202, 204 (Mo. banc 1996). A presumption exists favoring the reversal of a JNOV. *Faust v. Ryder Commercial Leasing & Servs.*, 954 S.W.2d 383, 388 (Mo.App.1997). We leave a JNOV intact only where "the favorable evidence and inferences are so strongly against the plaintiff as to leave no room for reasonable minds to differ as to the result." *Id.* (citations omitted). Where the trial court's grant of a JNOV is based upon a conclusion of law, we review its conclusion *de novo*. *Jungerman*, 925 S.W.2d at 204.

Essentially, a JNOV motion is a challenge to the submissibility of the case. *Allstates Transworld Vanlines, Inc. v. Southwestern Bell Tel. Co.*, 937 S.W.2d 314, 316 (Mo.App.1996). Thus, the motion is properly granted where the evidence does not support one or more elements of the plaintiff's case. *Breckenridge v. Meierhoffer–Fleeman Funeral Home, Inc.*, 941 S.W.2d 609, 611 (Mo.App.1997). In order to make a submissible case, the plaintiff must present substantial evidence supporting each element of his or her claim. *Spring v. Kansas City Area Transp. Auth.*, 873 S.W.2d 224, 225 (Mo. banc 1994). A JNOV has been referred to as a "drastic action," *Gesellschaft Fur Geratebau v. GFG Am. Gas Detection, Ltd.*, 967 S.W.2d 144, 146 (Mo.App.1998), and as an "extreme measure." *Wolfe v. Central Mine Equip. Co.*, 895 S.W.2d 83, 86 (Mo. App.1995).

"Quantum meruit means 'as much as he has deserved[.]' " *Rolla Lumber Co. v. Evans*, 482 S.W.2d 519, 521 (Mo.App. 1972) (quoting *Rodgers v. Levy*, 199 S.W.2d 79, 82 (Mo.App.1947)). When one person renders valuable services to another, and the latter accepts such services, the law implies a promise to pay the reasonable value of such services. *Esquivel v. Day's Inn of Branson*, 959 S.W.2d 486, 489 (Mo.App.1998).

In order to sustain a claim for quantum meruit, the plaintiff must shoulder the burden of proving the reasonable value of services performed. *Reid v. Reid*, 906 S.W.2d 740, 743 (Mo.App.1995).

[A]bsent a family relationship, where one performs valuable services for another, the benefit of which has been received and enjoyed by him, the law presumes an intention on the part of the former to charge and the latter to pay the reasonable value thereof and implies a promise on the one receiving the services to pay a reasonable value for said services.

*Smith v. Sypret's Estate*, 421 S.W.2d 9, 14 (Mo.1967) (quoting *Embry v. Martz' Estate*, 377 S.W.2d 367, 368 (Mo.1964)).

## Reasonable Value

What is the "reasonable value" of services that must be proved in a quantum meruit case? It has been said that reasonable value is "the price usually and customarily paid for such services or like services at the time and in the locality where the services were rendered." *Baker v. Brown's Estate*, 365 Mo. 1159, 294 S.W.2d 22, 27 (1956); *Cavic v. Missouri Research*

*Labs., Inc.*, 416 S.W.2d 6, 9 (Mo.App.1967). However, proof of reasonable value may not be accomplished simply by plaintiff stating the "standard price" which the plaintiff usually charges for a particular job. *McCardie & Akers Constr. Co.*, 647 S.W.2d 193, 195 (Mo.App.1983). There must be testimony or other evidence that the rate claimed was objectively reasonable in the marketplace. *Hoops v. Gateway Food Prods.*, 824 S.W.2d 451, 453 (Mo.App.1991).

In *Reid*, 906 S.W.2d at 740, a quantum meruit claim for legal services, the determination of reasonable value was found to be based upon the "time, nature, character and amount of services rendered, nature and importance of the litigation, degree of responsibility imposed on or incurred by the attorney, the amount of money or property involved, the degree of professional ability, skill and experience called for and used, and the result achieved." *Id.* at 743 (citing *Cervantes v. Ryan*, 799 S.W.2d 111, 115 (Mo.App.1990)).

Kinetic contends that it met its burden of proving reasonable value. Trigen notes that the jury, in awarding Kinetic $4,271,000.00 in damages, relied on Mr. Avers' testimony. Trigen argues that Avers' testimony was not competent to establish value.

In analyzing the motion for JNOV, the trial court was required to view the evidence in the light most favorable to the verdict, and to discard evidence and inferences contrary to the verdict. Although the evidence presented by Kinetic may be susceptible to more than one interpretation, our standard of review requires that the evidence be viewed favorably to Kinetic. *Jungerman*, 925 S.W.2d at 204. Our review of the trial judge's ruling reveals, however, that the dispositive issue in the trial court was a legal issue as to whether Avers' expert testimony was legally competent evidence of reasonable value. As to this legal issue, we conduct our review *de novo. Id.*

### Kinetic's Evidence

Kinetic presented evidence that it performed services of value during its quest to purchase the KC Steam System. Kinetic also presented evidence that after Trigen joined the process, ultimately forming a subsidiary which became sole purchaser of the KC Steam System, it used materials researched and developed by Kinetic.

Kinetic relied exclusively on the testimony of Carl Avers as to proof of the reasonable value of the services. Mr. Avers' methodology of valuation did not involve valuing specific services performed by Kinetic. Rather, Mr. Avers proceeded strictly on the assumption that Kinetic owned an exclusive and valuable right to purchase the steam system, which was transferred to Trigen, and accepted by Trigen. Avers contended that the reasonable compensation for Kinetic would be one-half of the net valuation (in excess of Trigen's investment) of the steam system as a going concern. Trigen objected to Avers' testimony throughout on the same grounds they now set forth.

The key issue for the trial judge was whether Kinetic established a certain reasonable value for its services, as required for a claim of *quantum meruit*, through the testimony of Avers. The trial court concluded that Avers' testimony did not establish a certain reasonable value for the services. Determining whether the trial court erred involves several questions. One question, of course, is whether Avers correctly interpreted the nature of any rights held by Kinetic which were transferred to Trigen. The nature of those rights is a matter of law, not an issue of fact. Another question is whether Avers properly approached the valuation of the goods and services provided to Trigen.

### Kinetic's "Development Rights"

First, we consider the nature of any right belonging to Kinetic which Kinetic provided to Trigen. Kinetic was one of the few companies responding to

KCPL's RFP. Only one other company offered to pay any money. Kinetic was by far the highest "bidder." Kinetic took no exception to any of the terms of the RFP, except for the refusal of Kinetic to deposit $100,000 in cash. Kinetic instead offered a corporate guarantee of $100,000 in lieu of cash. Kinetic's response to the RFP communicated inaccurately that Kinetic already had financing in place, and that Kinetic already had made provision for its own steam plant. Certainly, Kinetic's response to the RFP appeared far and away to be the most promising response to the RFP. Upon accepting Kinetic's response, KCPL's commitment to Kinetic (in the light most favorable to Kinetic) was to sell the system at the stipulated price in accordance with the terms of the RFP provided the parties were able to reach agreement on "acceptable sale documents" and the parties were able to obtain all necessary regulatory approvals. It was apparent from Schmidt's testimony at trial, however, that not all of the terms of the RFP were acceptable to either Kinetic or Trigen. Schmidt referred to one provision in particular as a "deal killer." [1] He attempted, unsuccessfully, to renegotiate this provision with KCPL. Trigen ultimately was able to negotiate some relief from the provision. It would seem that the value of any right to acquire the steam system would be only as great as are justified by the applicable terms of the acquisition. Also, the value of the right to negotiate for the purchase of the steam system was offset to the extent of the $4 million acquisition price, and to the extent of the extra costs to be incurred to cause the system to function effectively, including the need for acquisition of a steam source. The fair market value of the system in 1989 (including the steam source) at the time of the sale was disputed at trial, with estimates ranging from a value of zero or less to the seven or eight million suggested by Avers. We can assume, in view of the verdict, that the jury concluded that the net value of the steam system was substantial. But even if we assume that the net value of the steam system was so substantial that any right to acquire the distribution system for four million dollars would be a valuable right, it does not necessarily follow that Kinetic proved that its right to purchase the system was an exclusive right at the time any such right was transferred to Trigen, as Avers conceived it to be.

If Kinetic's purchase right was not exclusive at the time of the transfer, then Avers' methodology, as he himself conceded at trial, does not work. In *quantum meruit*, the recovery is based on the objective, reasonable value of the services provided. *See Patrick V. Koepke Const., Inc. v. Woodsage Const. Co.*, 844 S.W.2d 508, 516 (Mo.App.1992). For instance, if a lawyer draws a real estate contract for a purchaser, and the purchaser and the lawyer never agree on a fee, the lawyer's recovery in *quantum meruit* is not based on the net benefit to the purchaser of the real estate transaction. In other words, if the land actually contained previously undiscovered oil and mineral deposits worth millions, the lawyer is not entitled to a recovery of millions on the claim of *quantum meruit*. Instead, the lawyer is entitled only to the sum of money which would customarily and usually be charged by attorneys for the drafting of such a contract in similar circumstances. *Reid v. Reid*, 906 S.W.2d 740 (Mo.App.1995). Accordingly, if the land turns out to be worthless, the lawyer is still entitled to recover the reasonable value of the legal services provided the client.

Avers refused to even entertain a method of valuation in accord with the usual *quantum meruit* approach.

Q: As far as value of the individual services that Kinetic may or may not have performed you didn't do that, did

---

1. This was a provision which allowed KCPL the option to buy back the steam system in the future under certain circumstances.

you? You didn't look at the services, and you didn't put a value on them?

A: They are not relevant to my process.

Q: That was my next question, Mr. Avers. In other words, valuing the individual services that Kinetic may or may not have performed is not relevant to what you did, was it?

A: No, it is not.

Avers took a simplistic and misleading approach. Avers regarded Kinetic as having an exclusive right to purchase a valuable steam system. However, the facts show that Kinetic, without Trigen, would not have been able to acquire the system. The facts demonstrate even more clearly that, without Trigen, Kinetic would not have been able to acquire the system on satisfactory terms. Kinetic had agreed to unacceptable terms in the RFP, and was out of options, out of time with KCPL, and unable to find any financial partner apart from Trigen. KCPL was in the process of withdrawing from the negotiations. It was only when KCPL saw that, in Schmidt's words, "Trigen was for real," that KCPL's interest revived, and it was only because of Trigen's involvement that Kinetic was able to make a credible request for additional time to negotiate. Even after failing to reach an agreement with Trigen as to Kinetic's compensation, Kinetic was still unable to get any other company interested in time.[2] Thus, Kinetic was hardly able to negotiate from a position of strength as to the Kansas City system. Kinetic also failed to prove that after December 30, 1988, Kinetic could have legally compelled KCPL to sell its steam pipes to Kinetic. Kinetic also failed to prove that, if Trigen had sought to negotiate with KCPL entirely separately from Kinetic, it would not have been able to do so. Kinetic also failed to present evidence showing that Trigen would not have been able to obtain

regulatory approval for a purchase. Consequently, it was a mistake for Avers to regard Kinetic as transferring an exclusive right to Trigen and basing his valuation theory entirely thereon.

. Avers also made another mistake besides assuming Kinetic should be regarded as transferring exclusive purchase rights to Trigen. His second mistake was in concluding that the proper compensation for such a transfer would be fifty percent of the net value of the system. Avers described two occasions in which a developer obtained certain purchase rights with regard to an energy system, and then brought in a financial partner who provided the financing, with the developer then operating and maintaining the system. The developer and the financial party had split profits $\frac{50}{50}$ in those cases. Avers inferred from those cases that the appropriate way to value the "development right" transferred by Kinetic is to award Kinetic fifty percent of the net value of the system. Avers ignored the fact that, unlike the two transactions he described, in this case Kinetic and Trigen never contemplated that Kinetic would operate and maintain the acquired system. Rather, it was contemplated that Trigen, not Kinetic, would operate the system through a Trigen subsidiary. Schmidt and Corbier were offered the opportunity to work for the subsidiary for a salary, plus performance bonuses, plus stock in the subsidiary. Corbier accepted, and Schmidt did not accept because he did not want to leave his home in St. Louis. Kinetic was never contemplated to be involved in the operational aspect.

Avers also ignored the fact that, after Trigen's involvement, Trigen saved the negotiations, and then basically renegotiated and restructured the transaction. Trigen negotiated for the purchase of a steam source in addition to the pipes. Included in the renegotiations was the fact that

2. The MPSC had a time table on all of this because it was concerned that if no sale materialized, the customers would have to be allowed time to transition from steam to electricity. The MPSC had agreed that, if the system were not sold by December 31, 1990, KCPL could abandon the system.

KCPL agreed to pay the Trigen subsidiary $780,000 per year for Trigen to supply a standby steam capability for a period of at least two years. This, in effect, dropped the net purchase price significantly.[3]

Kinetic did not prove that it in fact functioned as a development partner. Kinetic apparently played a role in bringing Trigen and KCPL together, but Kinetic did not plead nor attempt to prove that it functioned as a broker in the transaction. Kinetic did present substantial evidence that it provided some additional research and investigation services for Trigen. There was evidence Trigen either requested or accepted these services. Kinetic could have calculated the reasonable value of Kinetic's services according to what such consulting services would ordinarily cost in the marketplace, but Kinetic elected to take an altogether different approach to reasonable value.

The cases Kinetic relies on are not helpful. *Kinetic* cites *Kisco Co. v. Verson Allsteel Press Co.*, 738 F.2d 290 (8th Cir. 1984), arguing that in *Kisco* the U.S. Court of Appeals upheld a *quantum meruit* verdict even though there was "no testimony as to the reasonable value of the information and services that the plaintiff furnished to the defendant." Kinetic overlooks the fact that in that case the evidence showed that if all of the contemplated information had been provided to the defendant and utilized by the defendant, it would have been worth $250,000 (because the parties themselves had agreed to that much in preliminary negotiations). There was also evidence that the defendant did not utilize all of the contemplated information (in designing a manufacturing system) but independently designed its own system. The court concluded, nevertheless, that the information provided by plaintiff in the initial phase of discussion was worth $110,000. The court arrived at this figure by deducting Defendant's cost of $140,000 from the $250,000 figure. The court of Appeals declined to disturb the award, finding it "not clearly erroneous." In *Kisco* there *was* evidence by which the value of the services could be calculated in a logical fashion. Here, there were no benchmarks to guide the fact finder (except for the improperly admitted opinion of Avers as to the value of a partnership interest). We fail to see how that case demonstrates that a *quantum meruit* verdict should be upheld even when there is "no testimony as to the reasonable value" of the services.

Another case cited by Kinetic is *Cole v. Control Data Corp.*, 947 F.2d 313 (8th Cir 1991). In that case, which involved conversion of a software program, the issue in question was whether the evidence of lost profits was unduly speculative. The court found that the expert's testimony was not unduly speculative. Kinetic compares Avers' testimony in this case to the testimony in *Cole.* Kinetic overlooks the fact, however, that the charge against Avers' testimony was not that it was unduly speculative and conjectural but rather that Avers' approach to valuation was incorrect because of incorrect assumptions and methodology.

Trigen points out that a case in which a similar approach for valuation was tried by plaintiffs in a *quantum meruit* case is the case of *Tax Lease Underwriters, Inc. v. Blackwall Green, Ltd.*, 642 F.Supp. 1492 (E.D.Mo.1986). In that case, a United States District Court case, the plaintiffs had developed a new type of insurance. Plaintiffs attempted to negotiate with defendant for the promotion and sale of the insurance. Plaintiffs attempted at trial to prove that there was an enforceable contract for the transfer of their insurance concept to defendants; then, having failed

---

**3.** It appears from the record that this arrangement continued for five years, meaning that Trigen's negotiations were worlds apart from the deal originally negotiated by Kinetic. The net purchase price, Trigen argues, for the *entire* system (pipes and steam source) was thus approximately $2.9 million, as opposed to the $4 million which Kinetic proposed to pay for the pipes alone.

to prove the contract, plaintiffs contended they were entitled to compensation in *quantum meruit.* At trial plaintiffs did not present evidence of the reasonable value of the individual services in developing and promoting the insurance, but argued instead that they were entitled to fifty percent of all the commissions earned on the insurance, and a four percent monitoring fee. Plaintiffs chose not to demonstrate the amount of the services rendered or the value of these individual services, but instead argued that the reasonable value was reflected by an arrangement providing fifty percent of all commissions and a four percent monitoring fee. Thus, even though their contract claim had been dismissed, plaintiffs were effectively attempting to enforce a partnership contract through a *quantum meruit* action. The court denied their claim on the ground that they chose an invalid method of proving the reasonable value of the services provided.

In this case, the testimony of Carl Avers could also be regarded as a misguided attempt to impose the value of a ${}^{50}\!/\!_{50}$ partnership agreement on the relationship between the parties. Avers failed to take a proper *quantum meruit* approach to valuation. Avers' testimony was not admissible as competent evidence of value, and even though it was admitted at trial over objection, it was not proper evidence of "certain reasonable value" in a *quantum meruit* case. Issues as to the admissibility and competency of Avers' valuation testimony are matters of law to be decided by the court, not matters of fact to be decided by the jury. Thus, even though we view the factual issues in the light most favorable to the verdict, we review *de novo* the issues of law. *Jungerman,* 925 S.W.2d at 204. The burden was on Kinetic to establish the value of its services according to a

proper legal formulation. Kinetic relied on the concept that Kinetic, at the time it transferred any rights to Kinetic, had an exclusive legal right to purchase the steam system, and that Trigen could not have purchased the steam system without Kinetic. However, the trial court decided that Kinetic never proved that such was the reality in fact.[4]

Kinetic could have made a submissible case of *quantum meruit* by attempting to prove the reasonable value of its services as a consultant in a proper *quantum meruit* fashion. Kinetic presented evidence that it did provide certain services to Trigen, which Trigen accepted. However, the evidence provides no proper way for a jury to put a value on those services. Nor does the evidence even itemize those services. The trial court did not err in finding that Kinetic failed as a matter of law to prove the reasonable value of its services.

■ The next question is the effect of Kinetic's failure to prove the reasonable value of its services. In *McCardie & Akers Constr. Co. v. Bonney,* 647 S.W.2d 193, 194 (Mo.App.1983) the court states that " ... failure to prove the reasonable value of materials and services furnished is fatal to recovery in *quantum meruit."* Then the court, after finding that the plaintiff failed to prove reasonable value in that case, nevertheless reversed the JNOV and allowed plaintiff another chance to prove reasonable value in a new trial. Also, there is other authority for the proposition that failure to prove reasonable value is not essential to submission where there is evidence that services were performed and accepted, because even if there is a failure of proof as to value, plaintiff is still entitled to the recovery of a nominal amount. *See Seelig v. M., K. & T. Ry. Co.,* 287 Mo. 343, 230 S.W. 94 (1921). *See also* MAI 26.05

---

**4.** We need not decide whether Avers' approach to reasonable value might have been proper under any other circumstances. As already mentioned, there were several problems with his valuation testimony. It is also logical that the law should not permit a claimant, by using creative approaches to reasonable value, to obtain a far better financial reward in *quantum meruit* litigation than it could have obtained by direct contract negotiation in the first place.

(the verdict director for a *quantum meruit* claim, which does not require proof of reasonable value). Accordingly, we conclude that even though the trial court's analysis on the issue of proof of reasonable value was exactly right, plaintiff still had a submissible case for a nominal award. Therefore, Kinetic is entitled to the benefit of having the court vacate the JNOV. *Kelley v. Kelly Residential Group, Inc.,* 945 S.W.2d 544 (Mo.App.1997) (trespass case where there was no danger shown from trespass but fact of trespass shown; court reversed JNOV and remanded for entry of judgment in nominal amount for plaintiffs).

 The next question is whether Kinetic should get only a nominal award or should get a new trial. The U.S. District Court in *Tax Lease* did not allow even a nominal award, much less a new trial. However, there is Missouri authority suggesting we have discretion to allow a new trial. *McCardie* suggests that when there is reason to believe plaintiff *can* prove reasonable value, a new trial should be allowed. *Id.* at 195. *See also Gee v. Payne,* 939 S.W.2d 383 (Mo.App.1997) (trial court in contract case had reserved ruling on proper measure of damages and plaintiff's evidence did not conform to eventual trial court ruling; appellate court reversed JNOV and remanded for new trial on damages). While we are satisfied that a new trial should not necessarily be allowed in every case, we are not persuaded that in this case allowing Kinetic a new trial on its present petition would be unjust and inappropriate.[5] Accordingly, we will exercise our discretion in this case to remand for a new trial[6] in order that Kinetic can attempt to prove a claim in *quantum meruit* for specific consulting services, including research and investiga-

tion services provided Trigen and which Trigen either requested or accepted.

### Conclusion

The trial court's order entering judgment notwithstanding the verdict is vacated, and the case is remanded for a new trial in accordance with this opinion. Each party shall bear its own costs on this appeal.

ELLIS and HOWARD, JJ., concur.

---

5. Although Kinetic did not specifically refer to all its services in the petition, it did refer to its "work product in developing and acquiring the development rights," which we will broadly construe as including its research and investigation services related to the "development" of the steam system.

6. We remand for a new trial pursuant to our decision to vacate the JNOV, within the discretion incident to that action. Accordingly, we need not address whether the trial court's alternative decision to order a new trial was properly entered.