**KINETIC ENERGY DEVELOPMENT CORPORATION, Appellant,**

v.

**TRIGEN ENERGY CORPORATION, Respondent.**

**No. WD 60733.**

Missouri Court of Appeals, Western District.

Feb. 28, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 24, 2003.

Application for Transfer Denied July 1, 2003.

Phillip Sanford Smith, Kansas City, MO, for Appellant.

Byron J. Beck, Kansas City, MO, for Respondent.

Before EDWIN H. SMITH, P.J., JAMES M. SMART, JR., and LISA WHITE HARDWICK, JJ.

JAMES M. SMART, JR., Judge.

Kinetic Energy Development Corporation appeals the trial court grant of summary judgment in favor of Trigen Energy Corporation on Kinetic Energy's claim in quantum meruit. We affirm the judgment of the trial court.

The claims of Kinetic Energy Development Corporation against Trigen Energy Corporation made an appearance in this court three years ago. That case was an appeal by Kinetic of a ruling by the trial court granting Trigen judgment notwithstanding the verdict. This court, in that appeal, agreed with Trigen and with the trial court that Kinetic had failed to properly prove its damages in its quantum meruit case. Nevertheless, because Kinetic had shown that it was entitled to at least nominal damages, this court vacated the judgment notwithstanding the verdict and remanded the case to give Kinetic another opportunity to prove the proper measure of its claim for reasonable compensation for consulting services. *Kinetic Energy Dev. Corp. v. Trigen Energy Corp.*, 22 S.W.3d 691, 703 (Mo.App.1999). On remand, the trial court entered summary judgment for Trigen. The trial court ruled that Kinetic still, on remand, continued to take invalid approaches to proving the value of its claim for quantum meruit. We agree.

This court had ruled in *Kinetic I* that Kinetic could prove its claim only by presenting evidence as to the reasonable value of its consulting services, demonstrated by evidence of the objective market value of such services as would customarily be charged within the energy consulting industry. *Id.* at 702. The trial court determined on remand that because the approaches that Kinetic insisted on taking were still legally invalid, Trigen was entitled to judgment as a matter of law. Kinetic now appeals, claiming the trial court erroneously interpreted and applied the law.

Although the factual background was set out in substantial detail in *Kinetic I,* we

will again state a brief summary of the evidence from the first trial.

Kinetic became aware that Kansas City Power and Light Company wished to sell its Grand Avenue Steam Generating Plant and its steam distribution system. Kinetic investigated the data related to the system and the plant. Kinetic entered into a tentative agreement to purchase the facilities. Kinetic, which lacked substantial capital, desired to locate an energy company with substantial resources in order to persuade such a company to engage in a joint venture to develop and operate the steam system. Alternatively, Kinetic hoped to negotiate an arrangement for the benefit of its principal officers, Tab Schmidt and Jerry Corbier, whereby they would be individually employed by the operating company in operating the steam system. Kinetic persuaded Trigen to step in as a "financial partner" in time to persuade the Missouri Public Service Commission to keep the potential sale an open matter.

Trigen eventually renegotiated the contract with KCPL. Kinetic and Trigen had an agreement concerning how Kinetic would be compensated for its efforts if the deal came together. The agreement, however, was too vague to be enforceable. Eventually, it became clear that Trigen had no need of Kinetic and could acquire the facilities itself. Kinetic and Trigen attempted to reach an agreement concerning a joint venture but could not agree. Kinetic, if it had possessed the resources to do so, or had been able to locate another financial partner, could still have purchased the facilities and could have excluded Trigen from the process. Kinetic, however, was unable to come up with the finances to do so.

Because there was a time limit placed on the sale by the Missouri Public Service Commission, Trigen then proceeded on its own to purchase the facilities. The parties conducted further negotiations thereafter concerning compensation for Kinetic, but again they were unable to agree. Kinetic then brought an action on contract, a claim for unjust enrichment, and a claim in *quantum meruit*. The trial court dismissed the contract claim in view of the lack of agreement on terms. Kinetic submitted its claim to the jury on the *quantum meruit* theory. Kinetic's theory of compensation at trial was based on the notion that Kinetic should receive half of the net value of the Kansas City steam facilities as a co-developer or joint venturer. This theory was based on the testimony of Kinetic's expert, Carl Avers, that he was familiar with two instances in which an energy company helped develop such facilities in association with another company and then operated the facilities thereafter. In those case, he said, the energy company was compensated as a fifty percent owner of the facilities.

After deliberations, the jury awarded Kinetic a verdict of 4.2 million dollars. The trial court thereafter granted Trigen's motion for judgment notwithstanding the verdict. This court, on appeal, held that the trial court, in rejecting Kinetic's approach to valuation of its claim, was correct in that Kinetic's evaluation methodology was not valid. *Id.* at 702. Nevertheless, we reversed the judgment notwithstanding the verdict and, citing *McCardie & Akers Construction Co. v. Bonney*, 647 S.W.2d 193, 195 (Mo.App. 1983), remanded the case to allow Kinetic another opportunity to prove the value of its claim in a proper manner. *Id.* at 703.

On this appeal, Kinetic contends in its first point that the trial court erred in granting summary judgment against it in that it was prepared to present competent evidence of the reasonable value of its services based on (1) "the results achieved and the potential income from the transac-

tion as is customary in the industry;" (2) "the amount of time expended by Kinetic times a reasonable daily rate as was paid for work on a similar transaction;" and (3) "the amount of out-of-pocket money spent by Kinetic on the transaction."

■ Trigen, in response to Kinetic's arguments, contends that the continuing fatal flaw in Kinetic's reasoning is that it assumes that since Kinetic was engaged in efforts to acquire the steam system for itself, which efforts proved to be unsuccessful, and because Kinetic thereafter provided information to Trigen to induce Trigen's participation, it is automatically entitled to a percentage interest in the revenues projected to be received by Trigen. We agree with Trigen that the mere fact that Kinetic engaged in work and expended resources, and that Trigen later bought the steam facilities, does not mean that Kinetic is entitled to fifty percent of Trigen's profit. We also agree that Kinetic did not prove a customary daily rate for consulting services, and that Kinetic did not prove that the amount of money Kinetic spent in working on the project was the proper measure of damages. In order to obtain relief in *quantum meruit* there must be (1) services performed which were requested or received by another; (2) benefit provided to the recipient as a result of those services. The objective value of the services provided must be proven by objective market data as to customary charges within the industry.

Kinetic forgets that it launched into this venture at first as a risk-taking entrepreneur seeking a financially sound co-adventurer. Kinetic was unable to reach an enforceable agreement with Trigen. Kinetic, after having persuaded Trigen to get involved, lost its own leverage due to time and financial constraints. Trigen then stepped into the driver's seat.

■ Had Trigen and Kinetic been able to work out a mutually satisfactory agreement, Kinetic may have received substantial compensation. Because they could not agree, however, Kinetic now seeks compensation as a joint venturer, as though the parties had agreed to the same. In truth, the evidence fails to show that Trigen ever would have agreed to a fifty-percent-of-profit compensation arrangement. In effect, Kinetic still wishes to have a jury place it in a better financial position than Trigen ever would have been willing to agree to in the first place. This is not the law. *Quantum meruit* is not a completely free-wheeling approach that allows a plaintiff as much compensation as the plaintiff subjectively believes is appropriate. Nor can a party utilize its own idea of what would be a reasonable hourly or daily rate for services. *Kinetic I*, 22 S.W.3d at 699. Rather, it is based on the concept of an objective and customary market for services. *Id.* As we mentioned in *Kinetic I*, the lawyer who advises a client and performs drafting services in connection with the acquisition of a piece of land is not entitled to *quantum meruit* recovery based on the projected profit from the land. *Id.* The fact that someone can testify that one or two particular attorneys agreed to perform such services on a contract for a percentage of the net profit of the land does not mean that is the customary and ordinary arrangement. *Id.* Nor does such an approach take into account all of the factual peculiarities that can exist in such contracts.

Kinetic completely failed to prove the value of its claim in the first trial. Many of the alleged services and expenses were incurred by Kinetic before Trigen even entered the picture. Kinetic attempted to use its position and its services as leverage to obtain a favorable deal with a development partner. Kinetic never was willing to settle for compensation as a broker/con-

sultant. It was aiming for higher stakes—stakes that did not work out. Kinetic now tries to impose that relationship on Trigen via the court system.

The valuation evidence developed by Kinetic in preparation for the second trial did not differ from the improper valuation evidence developed in *Kinetic I*. Carl Avers, the sole valuation witness in the first trial, testified in his 2001 deposition that his opinions had not changed in any way from those he had in the first trial in 1997. He also testified that the basis for his opinion had not changed. Avers said he would value Kinetic's "development process" as justifying a fifty-percent ownership in the steam system. Avers' methodology was still to use the EBDIT (earnings before depreciation, interest and taxes) number to calculate market value. From that, he deducted the purchase price and immediate capital improvements. Avers, in short, continued to insist that Kinetic was entitled to compensation as a "development partner."

Another valuation witness, Charles Schmersahl, described ten categories of services Kinetic performed, dating back to 1983. The services ranged from finding the opportunity and researching market conditions to assisting Trigen in its evaluation. Schmersahl did not quantify the services nor did he assign value to any of the services. Most of the activities of Kinetic were instigated by Kinetic well before 1989 and while Kinetic was pursuing its own goal and following its own business plan. Schmersahl said that such a development partner might have a percentage of twenty to forty percent, adding that it would be subject to "negotiation and agreement." Schmersahl did not perform an hourly rate analysis. Schmersahl had no prior experience valuing the kind of services performed in this case. Schmersahl said a reasonable daily rate for Kinetic's services

would be $5,581.00. He based this only on the fact that, in one other project, Kinetic ultimately ended up being paid an amount which, when divided by the number of days, averaged out to $5,581.00 per day. Schmersahl acknowledged that this rate was not a customary or recognized rate in the industry. Thus, the approaches to valuing its services taken by Kinetic were no better than the approaches taken in *Kinetic I*. The court did not err in concluding that Kinetic's evidence of value would be excluded at trial, leaving Kinetic with no valuation evidence to submit to the factfinder.

■ In its second point, Kinetic argues that summary judgment was improperly entered because the trial court failed to allow Kinetic enough time to complete discovery. Kinetic argues as follows:

> As a practical matter, Kinetic had pending, but answered, interrogatories and document requests concerning Trigen's knowledge of payment for services in comparable situations. This discovery may provide evidence of the value of such services that could be sufficient for a jury to award damages in this case. For example, if other situations of which Trigen is aware reveal that Trigen or others have consistently paid approximately $5,000 per day for similar services, a jury could use such information along with the evidence that Kinetic worked at least 421 days on the Kansas City project to arrive at reasonable value.

Trigen points out that Kinetic did not follow Rule 74.04(c) and (f), which specify that before responding to the motion, the party seeking additional discovery should seek a continuance and file an affidavit setting forth the additional discovery needed in order to respond to the motion for summary judgment. Kinetic did inform the court there was outstanding discovery,

but Kinetic filed neither an affidavit nor a statement of the significance of the outstanding discovery. Kinetic, therefore, cannot properly complain on appeal that the trial court erred in granting summary judgment, even though there was outstanding discovery. Kinetic was allowed many months to develop evidence and change its valuation approach. The summary judgment was granted less than a month before the scheduled trial date.

For all the foregoing reasons, we conclude that summary judgment was properly granted. Judgment is affirmed.

EDWIN H. SMITH AND HARDWICK, JJ., concur.