# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 02-4156

_____

O'Brien & Gere Technical     *
Services, Inc., a New York     *
Corporation,     *
    *
        Plaintiff/Appellee,     *
    *
     v.     *
    *
Fru-Con/Fluor Daniel Joint     *
Venture; Fru-Con Construction     *
Corporation, a Missouri Corporation;     *
Fluor Daniel, Inc., a California     *
Corporation,     *
    *    Appeal from the United States
        Defendants/Appellants.     *    District Court for the Eastern
    *    District of Missouri.
_____     *
    *
Fru-Con/Fluor Daniel Joint     *
Venture; Fru-Con Construction     *
Corporation; Fluor Daniel, Inc.,     *
    *
        Third Party Plaintiffs,     *
    *
     v.     *
    *
Reliance Insurance Company,     *
a Pennsylvania Corporation,     *
    *
        Third Party Defendant/     *
        Appellee.     *

_____

Submitted: November 20, 2003

Filed: August 26, 2004 (corrected 10/26/04)

_____

Before BYE, RICHARD S. ARNOLD, and SMITH, Circuit Judges.

_____

BYE, Circuit Judge.

This case illustrates the adage which counsels against going into business with someone who has less money than you.

The Procter & Gamble Company hired the Fru-Con/Fluor Daniel Joint Venture (the Joint Venture)[1] as a general contractor to build a paper-manufacturing complex in Cape Girardeau, Missouri. In April 1998, the Joint Venture hired O'Brien & Gere (OBG) to design and build six buildings in the complex for the lump sum of $15.3 million. In April 1999, after the project had undergone many changes and delays and the Joint Venture had paid OBG $21.8[2] million, the Joint Venture terminated OBG before it completed the work it had been hired to perform. OBG then brought this diversity action and submitted the case on a quantum meruit theory, seeking to recover the reasonable value of its services, which exceeded the contract price. The Joint Venture counterclaimed alleging OBG had breached the contract.

_____

[1]As the case caption indicates, the venture consisted of Fru-Con Construction Corporation and Fluor Daniel, Inc.

[2]For ease in reading, round numbers are utilized where they do not affect the analysis.

2

The district court[3] ruled the parties abandoned the contract, awarded OBG $5.4 million in quantum-meruit damages,[4] and dismissed the counterclaim. On appeal, the Joint Venture contends the court erred in finding the parties abandoned the contract and in calculating the reasonable value of OBG's services. We affirm.

I

A. Contract Formation and Early Departures from the Subcontract

On February 24, 1998, the Joint Venture sent OBG a request for proposal (RFP) inviting it to bid on the design and construction of the six buildings. The RFP had two important requirements. First, Buildings 51 and 52, which were to hold the paper production equipment, had to be completed by January 1, 1999, the date Procter & Gamble expected to start operating the plants.[5] Second, the RFP required bidders' proposals to conform to certain seismic requirements.

On April 8, 1998, OBG submitted a proposal to do the work for $15.4 million. Because of the Joint Venture's compressed timetable, OBG proposed holding a kickoff meeting within a week of the project award to determine the weight and location of Building 51, so OBG could then begin the design process.

---

[3]The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

[4]As discussed in Part III, the court deducted $1.4 million in back-charges from the quantum meruit award.

[5]Because they were to house the actual manufacturing plants, Buildings 51 and 52 were apparently the most important and costly. The four other buildings were warehouses or similar facilities.

OBG's proposal also contained a section entitled Commercial and Technical Clarifications and Exemptions. One commercial clarification was OBG's request the Joint Venture eliminate the "pay when paid" provision, under which the Joint Venture would become obligated to pay its subcontractors only after it was paid by Procter & Gamble. Because of OBG's limited cash-flow, OBG required payment within thirty days of invoicing in order to support its continued work on the project.

On April 14, 1998, the parties met to discuss the project and OBG's clarifications. Two days later, OBG submitted its Best and Final Offer (BAFO), which stated new technical clarifications. As a result of the technical clarifications discussed on April 14, the bid price rose to $15.8 million, which OBG then agreed to discount to $15.3 million, the final contract price.

The next day, April 17, 1998, the Joint Venture sent OBG a Notice to Proceed, which stated (1) the scope of the work would be according to the documents recently exchanged and discussed, and (2) the official subcontract would be issued within fourteen working days and was effective as of the date of the Notice. OBG understood the "recently exchanged documents" to include the Joint Venture's RFP, OBG's own original proposal, and OBG's BAFO. James Fox, OBG's project manager, executed the Notice and entered into contracts with sub-tier contractors.

On April 27, 1998, the Joint Venture forwarded OBG eleven new drawings for Buildings 51 and 52. On May 11, while the Joint Venture had yet to send the official subcontract, the Joint Venture dropped Building 76 from OBG's scope of work. Between this date and the date they executed the subcontract, July 6, OBG bid for a new building, 75. Though OBG started work on Building 75 on July 13, it could not submit invoices until September, when the Joint Venture executed the $7 million subcontract modification adding the Building to the scope of the work.

On July 1, 1998, the Joint Venture sent the official subcontract to OBG. Although the parties had already changed significant aspects of the agreement by dropping building 76 and adding 75, the subcontract substantially restated the Joint Venture's Request for Proposals.

On July 6, 1998, Mr. Fox signed and returned the subcontract. In his cover letter, he noted the subcontract had not "incorporated all previously communicated and agreed upon comments. To avoid further delays in subcontract execution and release of payment . . . [OBG] has executed the Subcontract based upon incorporation of . . . changes . . . by hand and initialed." He also stated milestones would follow in a separate document and crossed out the milestone dates in the body of the contract.

B. Design and Performance Delays

Neither party disputes the district court's finding both parties created delays through faulty design and performance. First the design delays. The parties agreed to use an expedited "design-build" process on the two most important buildings in the complex, 51 and 52, which would be the site of the manufacturing plants. Once Building 51's design was complete, Building 52's was to follow shortly with only minor modifications. Early on, however, the Joint Venture made frequent changes to Building 51's equipment loads by changing the location and quantity of equipment components the Building would support. OBG's engineers could not finalize the design for Building 51 until the Joint Venture could identify the proper equipment loads.

OBG's own design flaws compounded the problem. Most critically, OBG's bid had understated the amount of steel and concrete needed to meet the RFP's seismic specifications meant to prevent building drift in the event of an earthquake. Also, because the Joint Venture's initial drawings specified column lines could not be moved without permission, OBG assumed the Joint Venture had arrived at the proper

distances between buildings, although the subcontract stated that the Joint Venture's drawings represented a "conceptual phase."

As a result of the design flaws, Building 51's equipment-load requirements rose from the 800 tons indicated in the RFP to 1,500 tons. The amount of steel and concrete increased proportionally. While OBG had proposed using 790 tons of steel, for example, it actually used 1,600 tons to complete the building. In time, OBG admitted only 250 of the additional 810 tons could be attributed to the Joint Venture's increased equipment loads. The rest were attributable to OBG's design flaws.

There were also delays in performance. The contract called for completion of the project by April 20, 1999. When OBG was fired on April 9, 1999, none of the buildings had been completed and construction on Building 61 had not begun. Again, the parties appear not to dispute they both had a part in causing delays.

Starting with the eleven changes it forwarded to OBG on April 27, 1998, the Joint Venture made eighty changes to Building 51's design elements, including the weight and location of the mezzanines and the number, weight, and size of air handling units on the roof. These elements affected the structural design. As a result, within a four-month period through the summer of 1998, OBG had to reissue its "Issued For Construction" drawings for Building 51's foundation eight times and for its roof plan ten times.

OBG also experienced delays in completing the steel erection. Its erection sub-tier contractor was one month late in starting, the sub-tier contractor maintained a smaller crew than anticipated, and steel was late in arriving. Other delays were caused by OBG's defective doweling and use of defective anchor bolts.

Finally, an unanticipated delay occurred when OBG discovered poor subsoil and pre-existing fire lines which the Joint Venture had failed to designate in its

conceptual drawings. Because of these conditions, a 300-foot-long retaining wall, which OBG had agreed to build as work outside the scope of its bid, had to be redesigned and made much larger. Due to the delays in completing the wall, the construction of Building 51 had to be resequenced, with the dry-in date reset for October 15. Despite the many delays and disputes, OBG eventually missed the deadline for this critical first building by only two days.[6]

### C. Changes in the Scope of Work

Through Paragraph 3.0, the subcontract required OBG to make changes to its scope of work whenever it received written instructions for changes from the Joint Venture. Although OBG had to "promptly proceed in compliance with such written instructions," it could not collect on any increase in costs from the change until the parties had agreed to the price in writing.[7] The merger clause, moreover, required modifications to the subcontract be in writing; otherwise, they were not enforceable.

Thus, the two provisions – Paragraph 3.0 and the merger clause – created a lag between OBG's performance of changes and its receipt of payment for those changes: OBG was required immediately to comply with the Joint Venture's written instructions but it had to wait for the parties to agree to a price and then reduce the agreement to writing before it could receive payment. Naturally, these delays exacerbated OBG's cash-flow problems, and the possibility always lurked the parties might not agree on the price of a change after even after OBG had already completed the work.

---

[6]Indeed, though the Joint Venture was concerned about the number of changes it was passing on, OBG did not seek schedule extensions with respect to a majority of the changes.

[7]If the parties could not reach an agreement as to price, then OBG would be paid on a costs and materials basis for the change.

7

The change process itself is the subject of much dispute. Whenever OBG determined it was required to perform work outside the scope of its base, it sent the Joint Venture a Potential Change Orders form (PCO). If the Joint Venture agreed the PCO order was a change to the scope of the contract, or if the Joint Venture wanted to initiate such a change, the Joint Venture sent OBG a Change Order Request (COR). During the course of the project, OBG sent the Joint Venture 111 PCOs, and the Joint Venture sent OBG 89 CORs.[8]

The parties' disagreement came to a head as they tried to negotiate the costs to accelerate the dry-in date for Building 51. On July 16, 1998, the Joint Venture issued COR 28 and asked OBG to provide pricing to accelerate the partial dry-in date to October 15. On August 12, OBG submitted a proposal in response to the COR, indicating it could complete the acceleration for $2.1 million, a sum it later reduced to $1.8 million. OBG alleged the Joint Venture instructed it to spread this sum across five other open CORs, which, together with COR 28, became known as the Big Six. The Joint Venture, of course, denied giving the directive and argued OBG drastically underbid the contract and was attempting to make up the costs by submitting inflated CORs.[9]

_____

[8]The parties contemplated that, once a COR was approved, a subcontract modification would be issued for signature. To reiterate, the Joint Venture would not release payments without a signed subcontract modification. At trial, the Joint Venture asserted that only a modification created an enforceable agreement, while OBG asserted the approved COR was binding.

[9]OBG submitted COR 28 with a price of $616,000. The Joint Venture does not argue that $1.8 million price for the Building 51 acceleration was inflated. Thus, it appears OBG indeed did spread out the costs of acceleration among other CORs. On the other hand, the district court found evidence that OBG had also inflated the Big Six to cover some $300,000 in extra costs it incurred in redoing defective work.

8

On August 25, 1998, the Joint Venture signed the Big Six for a total amount of $2.9 million, and in September, it prepared the corresponding subcontract modifications. However, it never issued them. Instead, the Joint Venture wrote a letter to all its subcontractors announcing that its representatives could approve changes of no more than $5,000.

As the dispute over the Big Six swelled to a crisis, the parties held meetings on October 21 and 23, 1998, at which OBG informed the Joint Venture it would not perform work on change orders until the written subcontract modifications were issued. In response, the Joint Venture reminded OBG of its contractual obligation to comply with written instructions regarding changes and stated that OBG's refusal would place it in default. Consequently, OBG continued performing work on the disputed work changes.

At the meetings, it also became clear the parties disagreed about the point from which to measure scope-of-work changes: OBG insisted changes should be measured from the drawings in place on April 17, 1998, the date of the Notice to Proceed. The Joint Venture wanted to measure changes from the 30% drawings OBG issued on May 20, 1998. Like the Big Six, this issue was never resolved.

D. Impasse and Exhibit A

Having reached an impasse, the parties established teams of negotiators to examine the scope-of-work and change-order issues. The teams met through January and February 1999 and had minimal success. During this same period, the parties also executed Subcontract Modifications 002 through 007 in the total amount of $1.25 million. Through Exhibit A to these modifications, OBG attempted to proceed with the work even while protecting the right it claimed to be paid for the other, disputed changes and delays:

9

EXHIBIT A

This Contract Modification is entered into by the parties with the understanding that the Contractor [OBG] has made certain claims against the Company [the Joint Venture] for delays, accelerations, and schedule impacts occurring prior to the date of this Contract Modification . . . . and certain claims against the Company for scope of work changes and extra work that are not covered by this Contract Modification, all of which remain unresolved and open . . . . and with respect to which both parties hereto fully reserve and retain all of their respective rights, positions, defenses and arguments.

Thus, the parties proceeded with the work although they could not resolve their disputes. Ironically, even in signing the Modifications, the parties could not agree to the incorporation of Exhibit A. All the contract modifications contained a recitation that OBG agreed to perform the modification work "in accordance with all of the terms and conditions of the [subcontract]." Moreover, the Joint Venture representative did not initial Exhibit A, and instead wrote, "the Company rejects all changes to this contract modification form which was agreed to in the original subcontract."

E.  Subcontract Amendment and Escrow Fund

By the time the disputes over changes and scope of work came to a head in October 1998, OBG was experiencing cash-flow problems and was struggling to pay its sub-tier contractors. In an effort to keep the sub-tier contractors on the job, the Joint Venture and OBG executed an Amendment to the Subcontract on November 20, 1998. The Joint Venture agreed to make advance payments of up to $4 million in exchange for OBG's completion of new milestone dates. OBG received an advance of $1 million upon execution of the Amendment and another advance of $1.7 million in December 1998 when it achieved some of the amended milestones. OBG did not, in the end, meet all the new milestones, and the Joint Venture later learned OBG used the advance payments to satisfy its loans before paying its sub-tier contractors.

10

The Amendment acknowledged OBG's "cash flow problems have arisen as a result of both parties' delays in the timely resolution of Subcontractor's change orders which have produced corresponding delays in Subcontractor's invoicing and payments." The Amendment also contained a pledge by both parties that they would "continue negotiating their respective claims in good faith" and that "the parties shall conduct a meeting on or before December 3, 1998 to establish a procedure for the timely resolution of all change orders."

In March 1999, in yet another attempt to pay OBG's subcontractors, the Joint Venture agreed to place $5.3 million in escrow on the condition OBG's surety, Reliance Insurance, do the same. Reliance agreed. But, unbeknown to the Joint Venture, Reliance delayed establishing its fund until it renegotiated a priority-of-interest agreement with OBG's loan holder. Meanwhile, and without the Joint Venture's knowledge, OBG offered its sub-tier contractors settlement packages of fifty to sixty cents on the dollar. Upon learning of the settlement offers, the Joint Venture became more concerned the sub-tier contractors would quit, and this concern became another factor in its decision to terminate OBG.

F. Termination

Pursuant to the subcontract, the Joint Venture withheld the January and February 1999 progress payments because OBG had failed to reach the agreed-to goals. The Joint Venture then fired OBG in early April 1999.

II

The parties to this diversity action agree Missouri substantive law applies. In Missouri, "the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously

11

applies the law." Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. 1976) (defining standard applicable to bench trials). In this appeal, the Joint Venture argues the district court's judgment finding abandonment of the contract was against the weight of the evidence.

Under Murphy, the reviewing court sets aside the judgement as against the weight of the evidence only if it firmly believes the judgment is wrong. Id. ; Lucent Techs., Inc. v. Mid-West Elecs., Inc., 49 S.W.3d 236, 241 (Mo. Ct. App. 2001). This standard of review shows "great deference" to the findings of a trial judge. Alltype Fire Prot. Co. v. Mayfield, 88 S.W.3d 120, 123 (Mo. Ct. App. 2002).

A. Abandonment of the Contract

Under Missouri law, recovery in quantum meruit is generally limited to the agreed-upon price for the goods and services; the contract price does not limit recovery, however, where the parties abandon the contract. Holland v. Tandem Computers, Inc., 49 F.3d 1287, 1288-89 (8th Cir. 1995). Because OBG already received payment ($21 million) in excess of the contract price ($15.3 million), OBG can only recover in quantum meruit if the evidence supports a finding the parties abandoned the contract.

"An abandonment may be accomplished by express mutual consent or by implied consent through the actions of the parties." Schwartz v. Shelby Constr. Co., 338 S.W.2d 781, 788 (Mo. 1960). "Abandonment can be shown by acts and conduct consistent with the intent to abandon," and the district court may discount contrary testimony that no abandonment existed. Land Improvement, Inc. v. Ferguson, 800 S.W.2d 460, 464 (Mo. Ct. App. 1980). Proof of abandonment must be made by clear, unequivocal, and decisive evidence, and must manifest the parties' actual intent to abandon contract rights. McBee v. Gustaaf Vandecnocke Revocable Trust, 986

12

S.W.2d 170, 173 (Mo. 1999). The Joint Venture argues the evidence shows the parties continually manifested an intent to be bound by the subcontract.

In this case, reviewing the district court's judgment with the deference due to it under Missouri law, we cannot say we are left with a firm belief the judgment is wrong. See Murphy, 536 S.W. 2d at 32 ("Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong."). In other words, OBG presented clear substantial evidence the parties manifested an intent to abandon their rights under the contract.

Most fundamentally, the parties could not keep up with the extremely tight construction schedule they set for themselves. Contrary to their expectations in reaching an agreement, the kickoff meeting, subcontract execution, and first modification were each delayed by several precious weeks or more. Later, defective designs and performance by both parties caused further delays, which in turn had a detrimental domino effect in two ways: They set back the cumulative work schedule, and they exacerbated OBG's precarious cash-flow position, which in turn forced OBG again to postpone work. In short, the project progressed at a different pace from that contemplated by the subcontract; the parties departed from the contract milestones, even after they were amended.

Second, the actual job became substantially different from the contract job. The scope, quantity, and frequency of changes are factors in a court's finding the parties abandoned a contract. See Schwartz, 338 S.W.2d at 788-90. As to Building 51 alone, there were eighty changes to the equipment locations, and several changes to the equipment load, which was ultimately doubled. There were similarly frequent

13

changes to the number, size, and weight of air handling units on the roof, duct work, pipe racks, and other components. Such changes affected the structural design which was continually revised and delayed. OBG reissued the "Issued for Construction" drawings for Building 51's foundation eight times and for its roof plan ten times in four months. Similarly, the need to redesign the retaining wall, which itself was change work, complicated and delayed work on Building 51. Perhaps under normal circumstances in the construction business, a myriad of changes may not so transform a project as to reflect an abandonment of the contract by the parties. This case is different. While the parties understood a certain amount of change was inherent to the design and construction process, the number and frequency of the changes transformed, or so the district court could reasonably believe, the nature of the task OBG believed it undertook when it signed the subcontract while it was strapped for cash.

Third, about half-way through the work, it became apparent the parties did not agree about two fundamental facts: What documents defined the base scope of the work and the design stage from which work changes should be measured. The parties never resolved these differences. In other words, for half of the time they were together on the project, they operated by agreeing to disagree, without a shared understanding of basic rights and duties under the subcontract.

Fourth, though the subcontract allowed the Joint Venture to make payments directly to OBG's sub-tier contractors, the parties renegotiated advanced payments in exchange for new subcontract milestones in lieu of issuing subcontract modifications. Also, toward the end of OBG's services, the Joint Venture funded the escrow account. As the district court stated, "the need to resort to these extra-contractual devices to address a matter as fundamental as project pricing for change work reinforces the conclusion that the parties abandoned the contract."

14

The most crucial evidence supporting the court's finding of abandonment may be the breakdown of the work change process. The contract contained an inherent flaw: The Changes clause required OBG immediately to comply with change requests, even while the price was being negotiated. When the parties could not resolve their disputes over the prices of the Big Six, OBG was forced to continue working – something it could not do because of its cash-flow problems. In essence, given OBG's financial state, the Changes clause led to an impasse which effectively suspended the contract.

This flaw in the subcontract surfaced after a dispute erupted over Big Six. To whatever extent OBG underbid the contract and then inflated costs of the Big Six to make up the difference, there were other delays and changes for which OBG was not responsible and which increased OBG's costs substantially. Nevertheless, the Joint Venture withheld payment on the Big Six by declining to issue contract modifications as required by the subcontract, though the CORs contained undisputed charges, including the $1.8 million cost of accelerating Building 51. Meanwhile, apparently because it had already committed resources to the project and needed whatever cash it could get, OBG remained on the job. Likewise, apparently because it faced looming completion deadlines, the Joint Venture kept on the job a subcontractor it believed had underbid the contract and inflated CORs. In other words, the parties altogether abandoned the subcontract's flawed process for pricing and paying changes, resorting to whatever expedient they could conceive to see the project through.

The parties resorted to the Amendment and the modifications which were themselves problematic. In signing the Amendment and all the modifications but one, OBG crossed out language reaffirming the contract and attached Exhibit A, which acknowledged the fact that the change process had ground to a halt because of unresolved disputes. In turn, the Joint Venture representative did not initial Exhibit

15

A and instead wrote, "the Company rejects all changes to this contract modification form which was agreed to in the original subcontract."

The Joint Venture argues the Amendment and modifications are evidence the parties repeatedly reaffirmed the contract. In truth, however, the Amendment and modifications only cast light on the reality the parties maintained a working relationship outside the parameters of the contract, so much so that they could not even agree to disagree. We conclude there was substantial evidence to support the district court's finding the parties abandoned the subcontract.

III

Quantum meruit recovery is limited to the reasonable value of the services performed. Bash v. B.C. Constr. Co., 780 S.W.2d 697, 698 (Mo. Ct. App. 1989). In reviewing the district court's determination of reasonable value under Missouri law, we affirm the determination "unless there is no substantial evidence to support it, it is against the weight of authority, or it erroneously declares or applies the law." Kennco Contractors, Inc. v. Duncan, 53 S.W.3d 557, 559 (Mo. Ct. App. 2001) (applying the Murphy standard).

Reasonable value is "the price usually and customarily paid for such or like services at the time and in the locality where the services were rendered." Kinetic Energy Corp. v. Trigen Energy Corp., 22 S.W.3d 691, 697 (Mo. Ct. App. 1999) (citation omitted). The plaintiff must shoulder the burden of proving the reasonable value of its services. Id.

The district court determined the reasonable value of OBG's services as follows. First, it calculated the value of OBG's base subcontract work by adding the subcontract price of $15,300,000 and the price of the eight approved modifications,

16

$9,525,884, for a total of $24,825,884. Then, the court subtracted the Joint Venture's payments of $21,772,082, for a balance of $1,567,975 due on the base work.

The court then calculated the value of the change work at $3,797,891, reflecting the CORs which the Joint Venture had approved but not absorbed in executed contract modifications. In doing so, the court made a finding of fact the approvals, in absence of testimony from the Joint Venture employee who signed the CORs, represented the value of the change work listed on those CORs. Adding the value of the unpaid change work to the balance due on the base work, the court arrived at a figure of $6,851,693.

Finally, the court subtracted $1,369,007 for back-charges for OBG's scheduling delays and for the Joint Venture's costs in completing and redoing OBG's work. In summary, the district court concluded OBG was entitled to recover in quantum meruit the amount of $6,851,693, and the Joint Venture was entitled to offset that amount by $1,369,007 in back-charges, for a total recovery by OBG in the amount of $5,482,686.

The Joint Venture challenges the award on several grounds. First, it correctly cites Bash for the proposition the contract price cannot serve as the measure of damages in quantum meruit where the plaintiff has not fully performed the contract. 780 S.W.2d at 699 (stating the agreed price for full performance is not a reasonable value for partial performance). OBG, in turn, correctly distinguishes that case by citing Zeller v. Janssen for the proposition the contract can serve as a basis for valuation where there is evidence of the percentage of work completed. 569 S.W.3d 5, 6 (Mo. Ct. App. 1978) (stating contractor completed 68% of the work and therefore a reasonable value of the work within the scope of contract equaled 68% of the contract price).

These citations are red herrings, for the present case does not manifest the concerns which bar use of the contract price to begin with. Under the subcontract, the Joint Venture paid OBG incrementally for each milestone and for undisputed work changes. Using this progressive method, the Joint Venture paid OBG $21,772,082, well over the original subcontract price of $15,300,000. While OBG never finished the buildings, it clearly provided services worth the price of the original subcontract and its subsequent modifications. Indeed, because of the lag in the contractual scheme, the Joint Venture apparently did not pay OBG until well after it had completed the paid-for work. It is also undisputed the Joint Venture suspended payments when it believed that OBG could not proceed to the Joint Venture's satisfaction. Under this payment structure, at most there could be doubt as to OBG's full performance of only the last, marginal modification. Thus, the price of the subcontract, including modifications, was a reliable method for valuating OBG's base services.

Next, the Joint Venture argues the district court's calculations created a $2.3 million windfall for OBG. The Joint Venture points to the testimony of OBG's project manager who apparently stated "when we left the job we had $2.3 million of work remaining." From this testimony, the Joint Venture concludes the OBG's own work valuation priced the base work services at $21,030,057 ($23,340,0576 minus $2.3 million). As a factual matter, this conclusion does not follow necessarily from the manager's testimony. The court may have easily understood the testimony to reflect only the amount of work *remaining*, regardless of how much work OBG had already completed. For example, OBG could have performed $30 million worth of services to get to the point where there was still $2.3 million worth of work left to perform.

Finally, the Joint Venture points out its expert testified the CORs contained overstatements to the tune of $1.6 million. Indeed, the court specifically found the CORs generally contained "overstated unit prices and material quantities,

18

duplications, and mistakes." Still, as to the ten CORs which the Joint Venture had chosen to approve, the Court found the approval was sufficient evidence of the parties' valuation of the work. Faced with conflicting evidence, the district court apparently decided that, as to these ten CORs, the evidence of the Joint Venture's signature on the approval line weighed more heavily than the testimony of the expert witness.[10] This decision was within the province of the judge as the fact-finder.

We note the district court specifically found that its calculations did not compensate OBG for certain services which OBG undoubtedly provided but which were difficult to valuate reliably (for example, the additional work needed to build the retaining wall). We also note the Joint Venture argued all along that OBG had underbid the contract. As the district court suggested, the value of OBG's services may have exceeded the damages award.

IV

Because the finding the parties abandoned the contract is supported by the weight of the evidence, we affirm the district court's judgment. Because substantial evidence supports the district court's determination of the reasonable value of OBG's services, we affirm the court's damages award.

_____

[10]Moreover, among the ten disputed CORs was COR 28 for accelerating Building 51. To repeat, OBG argued this COR was understated by $1.2 million and the difference spread among the other five CORs in the Big Six. The court found that, among the nine other CORs in dispute, those belonging to the Big Six overstate the price by only $350,000. Thus, even on the expert's testimony, OBG provided the Joint Venture $850,000 in unpaid services.